FOURNET, Chief Justice.
 

 Woodman J. Collins was tried, convicted and sentenced under an indictment charging him with aggravated rape upon one Gladys E. Vatis; and from his conviction and sentence to “serve the death penalty as provided by law,” he has appealed, relying for reversal on a number of errors allegedly committed during the trial to which timely objection was made and bills perfected.
 
 [1]
 

 According to the record, Mrs. Vatis, a married woman thirty-five years of age, of the Caucasian race, who resided with her husband, a merchant seaman employed on the coastal route, and two teen-age daughters at Texas City, Texas, having received a message to meet her husband in Belle Chasse, Louisiana, on the morning of April 8th, 1960, departed from her home by car (1956 two door DeSoto) at about 8 P.M. on the night of the 7th; traveling alone, she proceeded on U. S. Highway 90 into Louisiana, passed through Lake Charles to Iowa, La., where, about 11:30 P.M., she stopped for gas, then continued, crossing an overpass into Jefferson Davis Parish and traveling north on Highway 165 at excessive speed; at about this time she became aware that a vehicle with one light was following her, and thinking it was a motorcycle policeman, she slowed — whereupon the vehicle passed, pulled up in front of her and stopped, so that she had a good view of its sole occupant, the driver; having become aware that the vehicle was an automobile but not a police car, she quickly pulled around it and speeded up to approximately 85 to 90 miles an hour; the driver of the other car pursued, and forced her off the highway onto the shoulder, where her car skidded and got stuck in the soft earth. The pursuing car, a light colored Pontiac stopped on the highway close beside her car; the driver, defendant Woodman J. Collins, a 30 year old Negro, jumped out and grasping the door handle beside Mrs. Vatis, wrenched it off; the door being locked, he broke the glass with his fist, and when Mrs. Vatis attempted to escape through the other door, he caught her, propelled her into his car, turned around and drove south to a gravel road,
 
 [2]
 
 then turned off, proceeded
 
 *711
 
 some distance and stopped, took Mrs. Vatis through a barbed wire fence and into a field adjoining the roadway, where he had sexual intercourse with her; returned with her to the car, and struck her numerous times on the head with a lug wrench,
 
 [3]
 
 then departed, alone, in his car, returning to his home in Iowa where, within a short time, he was sought and arrested.
 
 [4]
 
 Taken by police directly to the hospital (the time was then nearly 3 A.M.) and into the presence of Mrs. Vatis, who was being prepared for surgery because of head lacerations, he was promptly identified by her. Later that morning, at the Calcasieu Parish jail, the defendant made statements which were reduced to writing and signed by him, following which, in a police car and accompanied by police officers, he retraced the route taken on the previous night and pointed out the locations of the various happenings which had occurred. He also told where the lug wrench could be found; this he had hidden in an outhouse of his home before retiring on the night of April 8th. On April 11, 1960, defendant was charged with the crimes of rape, aggravated kidnaping and attempted murder, by warrant signed by the 31st Judicial District Court, Parish of Jefferson Davis; and on April 22, 1960, on order of the District Judge, counsel were appointed to defend him. He was indicted by the Grand Jury on October 5, 1960 and two true bills were returned, one being for aggravated rape under which the defendant is being tried in the instant case.
 

 Prior to arraignment the defendant, through his counsel, filed a motion to quash the general venire list, the grand jury venire, the grand jury and the bill of indictment; and when in due course the motion was called for argument the defendant moved for a continuance due to the absence of one of the witnesses subpoenaed on be
 
 *713
 
 half of the defendant, Mr. Charles A. Pitre. The Court overruled the motion, whereupon counsel objected and reserved Bill of Exception No. 2, the first assigned error urged on this appeal. In support of this bill it is counsel’s contention that Mr. Pitre, Clerk of Court and ex-officio member of the Jury-Commission, as its Secretary, was the only person who could have related the entire history of grand juries in Jefferson Davis Parish and the particulars surrounding the drawing of the grand jury venire from which was drawn the grand jury empaneled on October 5, 1960.
 

 It is apt to observe here, as did the Trial Judge in his Per Curiam, that the defendant, whose motion for a continuance was made orally, failed to comply with the formalities indicated, and these being general rules of procedure in criminal cases, they are sui generis and must be strictly followed : State v. Washington, 220 La. 963, 58 So.2d 195; State v. Jones, 233 La. 775, 98 So.2d 185. The mandatory requirements are that “Every application for a continuance shall be by written motion alleging specifically the grounds upon which it is based * * *” (R.S. 15:321), and “Every motion for a continuance based upon the absence of witnesses must show: (1) By a disclosure of all the facts which the absent witnesses are expected to testify to, the materiality of said testimony, and that said facts can be proved by no witness in attendance upon the court; (2) By a disclosure of facts and circumstances, a probability that the witnesses may be had at the time to which the trial is deferred; * * *” (R-S 15:322)
 

 However, the Trial Judge, in refusing to grant the continuance, did not rule on that ground, but rather for the reason that the motion lacked merit, in which we agree. Noting that Mr. Pitre’s absence was caused by the fact that he had suffered a heart attack, the Court said it did not appear Mr. Pitre’s testimony was essential, that he was only an ex-officio member of the Jury Commission, and the delay in waiting for him to recover his health
 
 [5]
 
 was not justified since it appeared to the Court that the five Jury Commissioners, all of whom were present, could readily answer any questions concerning the manner in which the grand jury was selected.
 

 Bill of Exception No. 3 was taken to the Court’s overruling of defendant’s motion to quash the general venire list, the grand jury venire, the grand jury and the bill of indictment. The argument in support of the motion was that Collins was denied a speedy trial in that, notwithstanding the fact that the regular grand jury was in session at the time he was arrested (April 8, 1960) and
 
 *715
 
 charged with certain crimes by warrant signed by the 31st Judicial District Court (April 11, 1960), his case was not presented; and due to the failure of the District Attorney and the Court to request a special session of the grand jury, it was not until the date of the next regular session for the selection of a grand jury (October 5, 1960) that his case was presented, he having been meanwhile incarcerated in the parish jail; that in the grand jury venire from which the said grand jury was selected, the Jury Commissioners deliberately and purposely included six Negroes; and that on October 5, 1960, a grand jury composed of five Negroes and seven whites was drawn and empaneled which indicted the defendant for aggravated rape and attempted muider — whereas the prior grand jury might not have indicted him at all; that no other cases were presented to the grand jury empaneled on October 5, 1960; and that by this unusual handling of his case, as well as by the systematic inclusion of members of the Negro race, he was prejudiced.
 

 The right guaranteed under the provisions of Article 1, Section 9 of the Louisiana Constitution to a speedy trial cannot be disassociated from the requirement that the trial be by an impartial jury and that no person can be held to answer for a capital crime unless upon the presentment or indictment of a grand jury. The right to a speedy trial does not operate to deprive the State of a reasonable opportunity of fairly prosecuting accused persons with all reasonable and necessary delays. State v. Frith, 194 La. 508, 194 So. 1. It is within the exclusive province of the district attorney, who is vested with the full charge and control of every criminal prosecution instituted or pending in any parish where he is district attorney, to determine whom, when and how he shall prosecute. R.S.
 
 15:17.
 

 The Per Curiam to this Bill states that the grand jury in session at the time of the commission of the alleged crime was composed entirely of members of the Cau casian race, and any indictment might well be set aside for the sole reason that there were no Negroes on the grand jury; and that a special grand jury was not ordered because it would be argued that such a jury was empaneled to consider only the Collins case. The Court was unable to recall any suggestion by the attorneys for the defense (who, as stated earlier, were appointed on April 22, 1960) as to any manner in which the defendant’s case was prejudiced by the delay, and expressed the view that on the contrary, such delays usually favor the accused. At this juncture it may be well to point out that during this entire time no request was made by the accused for a speedy trial, either personally or through his counsel, nor did he make any objection to the conditions of which he now
 
 *717
 
 complains. The Per Curiam further recites that according to the records, from the time the 31st Judicial District was created it has been customary that grand juries of the parishes composing the District have representatives not only of the Caucasian and Negro races but on some occasions of the Indian race as well, and that “the one and only exception that this Court can recall was the grand jury which was in session on, and which had previously been empaneled prior to, April 8, 1960 * * The Court then observed that “It seems entirely reasonable to this Court that the Jury Commission in noting its error of failing to have any Negroes on a grand jury did attempt to remedy this error by placing more Negroes on the subsequent grand jury [venire]that this defendant was not treated differently from any one else; that according to the custom over the years in the Parish of Jefferson Davis, prosecutions are usually by information of the District Attorney — only very serious criminal cases involving capital offenses being presented to the grand jury; that no other capital-offense crime was committed in Jefferson Davis Parish during the session of the grand jury empaneled on October S, 1960; and that this grand jury in every respect was treated as had been all others since creation of the 31st Judicial District.
 

 The testimony of the Jury Commissioners, attached to and made part of the Bill, reveals that when they were first selected and appointed to those positions some years previously by the District Judge, they were given general instructions to always be sure there was adequate representation of the races on both the petit and grand jury venires; that these instructions had been renewed from time to time and generally had been conscientiously followed; that the oversight in the case of the previous grand jury venire, and the customary caution from their Secretary to be careful of a representative selection, resulted in the placing of six members of the Negro race on the venire of twenty names from which was drawn the grand jury of October^ 5, 1960. We are impressed with the Jury Commissioners’ straightforward answers and conscientious attention to their duties; it is evident that there was simply an honest attempt on the part of each member to insure that he was complying with instructions given by the District Judge. As stated by this Court in State v. Green, 221 La. 713, 60 So.2d 208, “It would be fallacious, we think, to hold that, because jury commissioners, being conscious of the necessity of giving consideration to members of the colored race, as well as those of other races, in the selection of all juries in order to comply with the guarantees of the Fourteenth Amendment to the Federal Constitution, have purposely included Negroes on a jury panel, their forthright action constitutes discrimination in the absence of a showing that there was a planned limita
 
 *719
 
 tion upon the number of Negroes to be chosen.” (221 La. at 726, 60 So.2d at 212.)
 

 A review of the evidence we think readily supports the conclusion of the Trial Judge that there is a total lack of evidence to uphold the contention that there was any discrimination either by a systematic inclusion or exclusion of the races in preparing the venire from which the grand jury was drawn that indicted the accused, or that any of the substantial rights of the accused were in any manner prejudiced. Consequently this Bill of Exception has no merit.
 

 Prior to arraignment and pursuant to motion of defense counsel for appointment of a lunacy commission, which was granted, the Trial Judge convened a hearing to determine the present sanity of defendant; evidence was adduced, and at the conclusion of the hearing the Court ruled that defendant was presently sane and able to understand the proceedings and assist in his defense, whereupon defense counsel excepted, reserving Bill of Exception No. 4, and attached the testimony adduced at the sanity hearing. The ruling is said to be erroneous in view of certain testimony of Dr. Charles E. Sturm, resident psychiatrist at the East Louisiana State Hospital at Jackson and a member of the lunacy commission, to the effect that the defendant while at the hospital for a determination of present sanity was given a Wechsler adult intelligence test which showed an I.Q. of 63, this being a classification of mental deficiency — by reason of which, say counsel, in view of the provisions of R.S. 15 :267,
 
 [6]
 
 he is rendered incapable of understanding the proceedings and of assisting in his defense.
 

 The Trial Judge, in his Per Curiam to this Bill, states that “There was no medical testimony presented at this hearing or at the time of the trial which would indicate that there is any basis for a medical or legal opinion that the defendant * * * was at the time of the sanity hearing or at the time of the trial, insane.” This conclusion is supported not only by other testimony of Dr. Sturm but by testimony of Dr. Sabatier, the second member of the lunacy commission, both having given as their unqualified opinion that the defendant was thoroughly capable of understanding the nature of court proceedings, could recall past incidents, and was able to assist in his defense — this being the true
 
 *721
 
 test in determining the present sanity of an accused (State v. Chinn, 229 La. 984, 87 So.2d 315). Moreover, during the course of the trial, the fact is established that the estimate of an I.Q. of 63, the basis for the claimed mental deficiency, was erroneous,
 
 [7]
 
 and that defendant’s I.Q. is in fact in the 80’s, normal and average.
 

 Bills of Exception Nos. 10 and 12 were taken to the admission of photographs marked Exhibits S-6, S-7, S-8 (8" x 10" black and white), and Exhibits S-22 and S-23 (colored slides), introduced by the State and showing head wounds sustained by the prosecuting witness, over the defendant’s objection to their introduction as immaterial, because the photographs showed wounds that were inflicted after the act of rape was accomplished and were therefore evidence of another crime; and further, that the pictures are “highly inflammatory.”
 

 Counsel is in error in his contention that the photographs were not admissible for the reason that they portrayed a different and separate crime, for whatever the object of the beating administered to Mrs. Vatis, the manner in which the act was committed is so closely connected with the crime for which defendant is being tried that it forms part of the res gestae, and under the express provisions of the Code of Criminal Procedure, “What forms any part of the res gestae is always admissible in evidence,” (R.S. 15:447) and “To constitute res gestae the circumstances * * * must be * * * immediate concomitants of [the criminal act], or form in conjunction with it one continuous transaction” (R.S. 15 :448). See, also, Marr’s Criminal Jurisprudence of La., Vol. 2 (2nd ed.) 868, Sec. 565. Counsel in effect concedes this point in his admission that “the rule of res gestae as liberally interpreted by the Supreme Court would authorize testimony by the participants as to the beating with the lug wrench,” but contends that the photographs were made as gruesome as possible for the sole and only purpose of inflaming the jury, by showing Mrs. Vatis’ head shaved, as she lay on the Emergency Room table, “which magnified the wounds the victim undoubtedly received,” constituting reversible error under the decision of State v. Morgan, 211 La. 572, 30 So.2d 434.
 

 This Court in several recent decisions has discussed the Morgan case: State v. Ross, 217 La. 837, 47 So.2d 559; State v. Solomon, 222 La. 269, 62 So.2d 481; State v. Stahl,
 
 *723
 
 236 La. 362, 107 So.2d 670. In the last named case the Court'pointed out that “In the Morgan case the majority of this Court held that ‘If a gruesome photograph is not at all necessary or material evidence in the criminal prosecution it should be excluded if it may have a tendency to cause undue influence on the jury’; but in that case the court did not hold that gruesome photographs if otherwise admissible should be excluded merely because they are gruesome;” and observing that in two recent decisions this Court has discussed the Morgan case and clearly set out exactly what the law is in reference to the introduction of gruesome photographs, quoted approvingly first from the Ross case, “ ‘ * * * the fact that the photographs portray a repulsive spectacle and tend to prejudice the jury furnishes no valid ground for their exclusion where they are otherwise relevant,’ ” then • from the Solomon case, “ ‘ * * * the photograph was clearly admissible * * in corroboration of the Coroner’s procés verbal with reference to the description of the wounds * * * ’.” (236 La. at 377-378, 107 So.2d at 675.) Such evidence is admissible if offered for such purpose as to shed light on any issue; State v. Eubanks, 240 La. 552, 124 So.2d 543, citing 2 Wharton, Criminal Evidence (12th ed.), V. 2, Sec. 686, pp. 654-655, and, among others, the case of State v. Johnson, 198 La. 195, 3 So.2d 556. In the Solomon case we observed: “State v. Morgan is to be regarded as— indeed it is—a case of most unusual circumstances.”
 
 [8]
 
 (236 La. at 378, 107 So.2d at 676.)
 

 In his Per Curiam to Bill No. 10 the Trial Judge said “These head wounds corroborated the testimony of the prosecuting witness to the effect that she was forced to submit and was justified in her fear throughout the entire episode. * * * There is nothing in the testimony to suggest that these pictures exaggerated the wounds suffered by Mrs. Vatís. Dr. Snatic, coroner for Calcasieu Parish, referred to the pictures in his testimony and indicated that they were a fair representation of the wounds which he treated within a matter of a few hours after the attack” — the Court noting that the testimony was developed first out of the presence of the jury. In his Per Curiam to Bill No. 12, the Court explained that the colored slides showed the
 
 *725
 
 same wounds shown in the photographs; that the Court refused to permit several similar slides to be shown to the jury, and in the showing of S-22 and S-23, the pictures were flashed but once for a period not in excess of 7 seconds each, on a screen some 18 feet from the jury box, and the showing was not dramatized in any way.
 

 In brief in this Court, counsel has offered a novel argument which was not urged at the time the objection was made to the introduction of the pictures nor was it submitted to the Trial Judge in the bill of exception prepared by counsel: “ * * * that photographs to be admissible must accurately reflect the facts sought to be proved without alteration or dramatization,” arguing that in the instant case the victim was physically altered by removing her hair. Clearly there is no merit to' this contention. We cannot conceive how the photographs could more accurately reflect the wounds received than they did in this case; certainly it could not be successfully contended that photographs of wounds of the body would not be admissible solely because when the victim received the wounds, that part of his body was covered with clothing.
 

 Bill of Exception No. 18 was reserved to the Court’s refusal to sustain defendant’s objection to the admissibility of the written statement or confession signed by the defendant within a few hours of his arrest, and of statements made by the defendant when he pointed out to police officers the places where the offense occurred. Counsel for defendant objected on the ground that the exhibit, S-36, was not a confession; that the evidence showed defendant was not advised he could have an attorney, and at no time was defendant informed that any statement he might make could be used against him. The ruling of the Trial Court was that the exhibit is a confession because the defendant admitted therein the use of force to causé Mrs. Vatis to stop her car, and the use of force to break into the vehicle; admitted taking her from one place to another, and the actual intercourse ;
 
 [9]
 
 that the evidence was uniformly
 
 *727
 
 to the effect that defendant was never threatened, never asked to he left alone, never requested an attorney, and that he voluntarily answered all questions; also, that the statement or confession recounting the happenings of the day and night of April 7-8, 1960 was taken verbatim by Miss Bittras, Secretary to the Sheriff of Calcasieu Parish. In this Court counsel argue that neither the confession nor the statements made to the police officers were voluntarily made because of the mental incapacity of the defendant; and they further rely on the case of Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, to support them in their argument that the conviction should be reversed because defendant did not have counsel when the confession was made and the statements given, and that the police “while questioning him were not merely trying to solve a crime or to absolve a suspect, but were concerned solely with securing a statement from defendant in order to convict him” — this being language used by the U. S. Supreme Court in the above opinion.
 

 Nothing is to be gained by defendant’s reliance on his asserted mental incapacity; as stated earlier in this opinion (in disposing of Bill of Exception No. 4), a preliminary evaluation of his intelligence quotient, based on an erroneous assumption, was corrected after medical tests indicated that he has normal and average intelligence.
 
 *729
 
 The so-called confession, partially exculpatory in content though containing inculpatory facts as well, was shown by positive testimony on the part of several witnesses to have been freely and voluntarily given by defendant, in his own words and in narrative form, following advice that any statement given might be used in evidence against him, then transcribed from the dictation and read to him in full; stenographic errors, two in number, were initialed by the defendant following correction; and defendant’s conduct in pointing out the locale of happenings on the night or early morning of April 8, 1960 was completely without coercion. The decision in the case of Spano v. New York, supra, was based on a factual situation so unlike that with which we are here presented that the rule of the case is not apposite, and therefore does not profit the defendant.
 
 [10]
 

 Bill of Exception No. 20 was reserved to the Court’s refusal to sustain defense counsel’s objection to permitting Dr. Sturm, the expert psychiatrist, to refer to and state opinions of Dr. Sturm’s colleagues at East Louisiana State Hospital, on the ground that such testimony is hearsay and therefore inadmissible.
 

 The Per Curiam to this Bill explains that two sanity commissions were requested by defendant, but at different times, the first to inquire into his present sanity and the second into his sanity at the time of the commission of the crime; he was therefore transferred on two separate occasions to the said Hospital, on both was examined by numerous doctors and other trained personnel, and was presented to the entire staff; Dr. Sturm (recommended to the Court by the Hospital Superintendent as best qualified of resident psychiatrists to serve) testified first in the preliminary sanity hearing, and later at the trial, on each occasion using information and medical opinions obtained from his colleagues at the staff meetings. The Court pointed out that the low I.Q. of 63, given by Dr. Sturm at the first sanity hearing, was a result of
 
 *731
 
 information from a psychologist, Mr. Lockridge, and defense counsel did not then object to the testimony as hearsay; however, it developed during the trial that Mr. Lockridge’s re-examination disclosed that the defendant had a substantially higher I.Q. than the first test indicated. The Trial Judge observed: “It seems entirely proper to this Court to permit Dr. Sturm, the expert medical witness qualified in psychiatry, to refer to all medical reports and medical opinions which were developed while the defendant was under Dr. Sturm’s care in the East Louisiana State Hospital and it was for this reason that the objection raised by defendant’s counsel was overruled.”
 

 In this Court defendant asks us to note especially that this “hearsay testimony was allowed to go to the jury on the issue of insanity at the time of commission, the very basis of Woodman Collins’ entire defense,” and complains that “There would be no opportunity to cross-examine Mr. Lock-ridge, either on his qualifications or the reason for the fluctuating opinion as to the defendant’s I.Q.” Clearly, the ruling of the Trial Judge was correct; the findings of Dr. Sturm’s colleagues and associates as a result of their evaluation of defendant’s mental state were factors upon which he, Dr. Sturm, based his opinion, and were properly disclosed since an expert witness, in giving opinion testimony, “must state the facts upon which his opinion is based,” R.S. 15:465. Besides, it may be well to point out (as revealed by the Per Curiam) that Lockridge was present during the trial and was sequestered as a witness, having been subpoenaed by the defense, but was never called to testify.
 

 Bill of Exception No. 26 was reserved upon denial of defendant’s motion for a new trial, incorporating all of the previous exceptions taken throughout the course of the trial. Those urged on appeal have been disposed of above, and this Bill therefore presents nothing for our review.
 

 Bill of Exception No. 27 was reserved to the Court’s refusal to sustain defendant’s motion in arrest of judgment, based on the contention that the indictment, in the long form, is fatally defective in that it fails to “state every fact and circumstance necessary to constitute the offense” as required by R.S. 15:227 (Code of Criminal Procedure) ; that the indictment here
 
 [11]
 
 follows the language of R.S. 14:41 (Louisiana Criminal Code), which is the general
 
 *733
 
 definition of rape and contains no punishment, whereas neither aggravated rape as defined by R.S. 14:42
 
 [12]
 
 nor simple rape as defined by R.S. 14:43
 
 [13]
 
 is charged, thus rendering the indictment fatally defective. Counsel contend that to charge aggravated rape, the indictment must set out that the female resisted to the utmost or was prevented from resisting to the utmost by acts and/or threats of great and immediate bodily harm, accompanied by the apparent power of execution, or that she was under 12 years. of age; and to charge simple rape, certain other recitals are sacramental.
 

 The Trial Judge expressed the opinion that the words “assault,” “violently” and “ravish” sufficiently indicate that the act committed violates subsections (1) and/or (2) of Article 42 of the Criminal Code (quoted in footnote 12), continuing “This Court is of the opinion that the words ‘against her will and lawful consent’ sufficiently state the ‘unlawful consent’ element of the crime and that further particularization is not necessary; this seems in accord with Article 227 of the Louisiana Code of Criminal Procedure [R.S. 15:-227] which reads in part: ‘The indictment must slate every fact and circumstance necessary to constitute the offense, but it need do no more * * * Observing that had the defendant needed more specific infor
 
 *735
 
 mation as to the “unlawful consent” element of the crime charged, a request for a bill of particulars would have been appropriate, the Trial Court, quoting the tests laid down in our jurisprudence,
 
 [14]
 
 remarked there was never any doubt on the part of the Court, nor did there appear to be any doubt on the part of defendant’s appointed counsel, that defendant was on trial for aggravated rape, and that, in fact, defense counsel had argued forcefully to the jury that defendant should receive a verdict of “guilty without capital punishment” rather than one of “guilty as charged.” Clearly there is no merit to this Bill.
 

 For the reasons assigned, the conviction and sentence are affirmed.
 

 HAWTHORNE, J., absent.
 

 [1]
 

 . Twenty-seven bills were reserved, but many have been abandoned and only the remaining nine are urged, these being Nos. 2, 3, 4, 10, 12, 18, 20, 26 and 27.
 

 [2]
 

 . According to the testimony of the victim, the defendant, after telling her in vulgar language what he intended to do to her, “grabbed me by the throat and by the hair, pulled me out of my car, went in front of my headlights pushing me back by tbe hair and by the throat, got even with the side of his ear and hit me on the right hand side of my head with his fist,” causing the left side of her head to strike the top of the door frame and become larcerated; that after pushing her into his car and entering on the same side, thus pinning her and partially sitting on her, he got behind the wheel, and after making the U-turn, when
 
 *711
 
 she grasped the door handle, said “If you try to jump out, I’m going to kill you;” that “every now and then” he would strike her on the left side of her head, where it was bleeding, with his fist.
 

 [3]
 

 . Mrs. Vatis further testified that defendant, after stopping the car, continued to threaten to kill her, dragged her across the barbed wire fence enclosing the field, and dragged her back afterward; that he then told her to “Get in this ditch and take a bath,” and having got the lug wrench from the trunk of his car, he pushed her backward into the ditch, struck her repeatedly on the head with the wrench (more than twelve times, when she became numb and lost count), then pushed her down in the ditch and finally departed.
 

 [4]
 

 . The prompt arrest of the defendant was occasioned by the fact that a description of him and his car was given to the police by Mrs. Vatis while she was being driven to the hospital in a police car (she had staggered from the watery ditch beside the gravel road where she had been left, to farm houses, seeking assistance) ; the information was broadcast on police radio and a police officer in a patrol car reported, on ear-to-car radio, that on the previous night at approximately 3 :00 A.M. he had stopped a car (a 1952 faded blue Fordor Pontiac, no license plates, one headlight out) fitting the description; another police officer knew that the said car belonged to the defendant.
 

 [5]
 

 . It was proved to the Court’s satisfaction that Mr. Pitre’s physician would not permit him to testify for a minimum of two months. Mr. Pitre has since died.
 

 [6]
 

 . R.S. 15:267, treating of the plea of present insanity and procedure in connection therewith, provides in part: “* * * If the court, after the hearing, decides that the defendant is able to understand the proceedings and to assist in his defense, it shall proceed with the trial. If, however, it decides that the defendant, through insanity or mental deficiency is not able to understand the proceedings or to assist in his defense, it shall take proper steps to have the defendant committed to the proper institution. * * * ”
 

 [7]
 

 . At tlie time of defendant’s first period of observation at tlie hospital, it was a conclusion of Mr. Loekridge, the hospital psychologist, that the defendant had an' I.Q. of 63, based on his premise that defendant could be classified as a chronic brain syndrome because he appeared to: be afflicted with a tic, or movement of the head; that classification was later disproved, following an electroencephalogram and a complete neurological examination by a medical specialist in that field.
 

 [8]
 

 . State v. Solomon, 222 La. 269, 62 So.2d 481, contains the following résumé of the Morgan case: “In that matter, a ghastly picture of the female victim’s body, accentuated in its cadaverous appearance by indentations of the flesh made by iron bars on which it had been placed by third persons after the murder. was offered in evidence.
 
 A
 
 majority of the Court found the picture to be inadmissible because its introduction was wholly unnecessary to the state’s case. There, the ghastliness of the picture was so pronounced and the circumstances surrounding its submission in evidence of such an exceptional nature, that the court was able to draw the conclusion that it was offered solely for the purpose of prejudicing the jury against the defendant.” (222 La. at 278, 62 So.2d at 483.)
 

 [9]
 

 . The statement signed by defendant and witnessed by police officers present when the complete contents were read to him and signed by him is as follows: “After I have been duly warned by Sheriff H. A. Reid, Jr., Deputies Hilliard S. Foreman, R. V. Kirk and Anna M. Bittras, that I do not have to make a statement at all, and that any statement I make may be used in evidence against me on the trial for the offense concerning which this statement is herein made, I wish to make the following voluntary statement to the aforesaid persons: My name is AVoodman Collins, my address is P.O. Box 117, Iowa, La. I am 30 years old. Lake Charles City Sanitation Department [apparently his place of employment], On April 7, 1960, I left home about 7 o’clock, I was too late to go to work and went to my Aunt Carrie’s. During the day, myself and some other people drank quite a bit. I left my Aunt Carrie’s about 4:00 P.M. and visited several bars in Lake Charles, going from one bar to another. I left Lake Charles
 
 *727
 
 about 10:00 or 10:30 P.M., Thursday night, April 7th, 1960, to go to Iowa, La. The first time I saw the car was just past the trafile light in Iowa. I passed her just past the overpass on Highway 165 and went around her. We were headed north on Highway 165. We passed each other two or three times after that. While she was passing around me, the car went into the ditch and stopped. When we stopped we were three or four miles north of the overpass on Hwy 165. I stopped my car right behind her and my car was still on the highway and I got out of my car. I walked up to her car and she called me a vulgar name. When she called me a vulgar name, it made me angry. Her car windows were rolled up and I struck at her through the window breaking the window glass with my fist. When I struck at the glass window of the car, the woman got out of the other side of her car and it looked to me like she was trying to get to my car which was still running. She got in my ear on the opposite side of the driver’s side and she was in the middle of the seat when I got to the car. I got in my car on the opposite side of the driver’s side and crawled over her to get under the wheel. I talked to her and asked her for a date. She told me ‘yes.’ I turned the car and headed south. I went a short way down the highway and turned right on a gravel road. I stayed on the gravel road and passed one house and she told me she wanted to go to that house. I did not stop and went on down the gravel road for a quarter of a mile. I then stopped my car. I asked her if it was better to have intercourse in the car or out and she said ‘out.’ We both got out of the car and crossed the fence and went about 5 yards from the fence. We then had intercourse. She did not resist me. After we finished, we came back, crossed the fence. She asked me if I was going to take her back to the highway. I told her ‘yes.’ After we got into the ear she started cussing me and then- we had a fight.”
 

 [10]
 

 . In the Spano case, admission in evidence of a confession was held to be reversible error because involuntarily given, under the following circumstances: The defendant, a 25 year old man, after having been indicted in a New York State court on a charge of first degree murder and a bench warrant having issued for his arrest, retained counsel; the latter surrendered him to authorities in the early evening hours and the defendant was immediately subjected to a prolonged interrogation by numerous law enforcement officers, continuing through the night and without respite into the following morning; his repeated requests to see his attorney were denied; his continued refusal to answer questions of the police, as instructed by his attorney, was finally overborne by official pressure, fatigue, and sympathy falsely aroused because of the supposed trouble caused by him to his personal friend, a fledgling police officer, to whom he had, shortly after the homicide, confided his version of the events leading to the shooting of the deceased; he finally gave replies, constituting an admission of guilt.
 

 [11]
 

 . That portion of the indictment pertinent to this Bill is: “That in the Parish of Jefferson Davis, Woodman J. Collins, on or about April 8, 1960 * * * committed the crime of aggravated rape in that he did then 'and there; with crim"inal intent, feloniously, wilfully and violently in and upon one Gladys E. Vatis, a female person, not the wife or judicially separated from bed and board from the offender, make an assault, and did then and their feloniously, wilfully and violent
 
 *733
 
 ly, against her will and lawful consent, rape, ravish and carnally knew and have sexual intercourse with the said Gladys E. Vatis in violation of Louisiana Revised Statutes, Title 14, Section 42.”
 

 [12]
 

 . “Aggravated rape is a rape committed where the sexual intercourse is deemed to be without the lawful consent of the female because it is committed under any one or more of the following circumstances :
 

 “(1) Where the female resists the act to the utmost, but her resistance is overcome by force.
 

 “(2) Where she is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
 

 “(3) Where she is under the age of twelve years. * * *
 

 “Whoever commits the crime of aggravated rape shall be punished by death.”
 

 [13]
 

 . “Simple rape is a rape committed where the sexual intercourse is deemed to be without the lawful consent of the female because it is committed under any one or more of the following circumstances :
 

 “(1) Where she is incapable of resisting or of understanding the nature of the act, by reason of stupor or abnormal condition of the mind produced by an intoxicating, narcotic or anesthetic agent, administered by or with the. privity of the offender; or when she has such incapacity, by reason of a stupor or abnormal condition of mind from any cause, and the offender knew or should have known of her incapacity.
 

 “(2) Where she submits under the belief that the person committing the act is her husband and such belief is intentionally induced by any artifice, pretense, or concealment practiced by the offender.
 

 “(3) Where she is incapable, through unsoundness of mind, whether temporary or permanent, of understanding the nature of the act; and the offender knew or should have known of her incapacity.
 

 “Whoever commits the crime of simple rape shall be imprisoned at hard labor for not less than one nor more than twenty years.”
 

 [14]
 

 . As. noted in State v. Richardson, 220 La. 338, 56 So.2d 568, and cases cited in 220 La. at 343, 56 So.2d 568, under the jurisprudence of this Court the tests
 
 *737
 
 for determining the sufficiency of a bill of information or an indictment are: (1) Whether it is sufficient to inform the court of an offense charged so that the lower court may properly regulate evidence sought to be introduced;' (2) whether it informs the accused of the nature and cause of the offense charged so that he will be enabled to prepare his defense, and (3) whether it is sufficient on its face to support a plea of former jeopardy in the event of an attempt to try defendant more than once for the same offense.