**Woodman J. COLLINS, Appellant,**

v.

**Victor G. WALKER, Warden, Louisiana State Penitentiary, Angola, Louisiana, Appellee.**

**No. 20537.**

United States Court of Appeals
Fifth Circuit.

July 21, 1964.

Certiorari Denied Nov. 9, 1964.

See 85 S.Ct. 189.

Benjamin C. Dawkins, Jr., District Judge, dissented.

418

Herschel N. Knight, Stephen P. Coco, Jennings, La., for appellant.

Teddy W. Airhart, Jr., Asst. Atty. Gen. of La., Jack P. F. Gremillion, Atty. Gen. of La., Baton Rouge, La., Bernard Marcantel, Dist. Atty., Jennings, La., for appellee.

Before RIVES and JONES, Circuit Judges, and DAWKINS, Jr., District Judge.

RIVES, Circuit Judge.

Additional briefs have been submitted on this second petition for rehearing, and the Court has heard further oral argument. At the outset, appellee objects that our opinion, reported at 329 F.2d 100, contains substantial errors of fact. In particular, appellee urges the following:

(1) "There is nothing in the record to support the Court's finding that ' * * * no other case was scheduled to be considered by that Grand Jury.'" The burden of appellee's criticism is contained in the following sentence of his brief: "Indeed, when the Court considers the fact that a grand jury serves for six months, it would be literally impossible for the jury commission to know that no other cases would be scheduled for consideration by that grand jury." That is quite true. Our statement was in the past tense, "*was* scheduled" not "*would be* scheduled," and was plainly limited to the crucial time when the jury commission chose the list of names of twenty citizens from which the foreman was selected and the other eleven grand jurors were drawn. That statement was accurate and we adhere to it.

(2) Appellee urges that: "Mr. Arceneaux did not testify that the 20 names selected for the Grand Jury Venire were in addition to the General Venire of 300." In the opinion we quoted at length from the testimony of Mr. Arceneaux, including the following:

"A. That grand jury was not picked out of that original group of three hundred.

"Q. It was not?

"A. No.

"Q. How was that—

"A. The grand jury *is* picked by names in the additions to the three hundred.

"Q. In additions to the three hundred?

"A. Correct."

"Q. Now, as I understand it, when you prepare the grand jury you don't look in the box of three hundred and select out twenty names? You simply get together and you all select twenty names, period, and put them on there. Is that right?

"A. That's correct." 329 F.2d at 102, 103.

Appellee insists that "instead the grand jury venire was taken from those names added to the 1958 list, which 1958 list had been depleted because of the removal of those names drawn or selected for the various juries drawn since 1958."

While we think that our statement was accurate, we will accept the appellee's version. The difference is immaterial for the reasons stated in our opinion, as follows:

" * * * even if the list of twenty had been selected from the general venire list, it would nonetheless remain true that six Negroes were purposely included in that list of twenty because of the fact that they were Negroes; that the identities of the six Negroes so included were known to the jury commissioners; that they knew also that the grand jury to be chosen from that list of twenty was to consider whether to return an indictment against Collins, and that no other case was scheduled to be considered by that grand jury." 329 F.2d at 104.

(3) Appellee urges: "At page 10 of the March 11th opinion, it is stated that Collins was indicted for aggravated kidnapping. The only suggested source of this finding is in appellant's brief, for Collins was not indicted for aggravated kidnapping." The order of the State Court appointing counsel to represent Collins stated that he was " * * * charged with the crimes of aggravated rape, aggravated kidnapping, and attempted murder by warrants signed by this Court * * *." (R. p. 29.) He was not, however, indicted for aggravated kidnapping, but was indicted for aggravated rape and attempted murder (R. p. 5). This correction, though immaterial, is made for the sake of accuracy.

█ In the list of twenty from which the foreman was selected and the other eleven grand jurors drawn, six Negroes were purposefully included because they were Negroes. The other fourteen on the list of twenty were white persons. In such an organization of the grand jury, there was discrimination against Collins because of his race or color and he was deprived of the equal protection guaranteed by the Fourteenth Amendment. Cassell v. Texas, 1950, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; Akins v. Texas, 1945, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Hill v. Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559. That was the extent of our holding. Collins v. Walker, 5 Cir. 1964, 329 F.2d 100, 105.

Except for numbers, the grand jury was organized according to a system remarkably like that considered in Hill, Akins and Cassell, supra. As said in Cassell, "Acting under the Texas statutes, the Dallas County grand-jury commissioners chose a list of sixteen males for this September 1947 grand jury from citizens eligible under the statute. The judge chose twelve of these for the panel. No challenge is now made to the fairness of this statutory system. We have approved it." 339 U.S. at 283, 284, 70 S.Ct. at 630. As further observed in Cassell, the grand-jury commissioners for 21 consecutive lists subsequent to the Hill case had limited Negroes in the list of 16 selected for grand jury service to not more than 1 on each grand jury. 339 U.S. at 285, 286, 70 S.Ct. 629. Mr. Justice Reed said that, "If, notwithstanding this caution by the trial court judges, commissioners should limit proportionally the number of Negroes selected for grand-jury service, such limitation would violate our Constitution. Jurymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race." 339 U.S. 286, 70 S.Ct. 631. " * * * the Constitution requires only a fair jury selected without regard to race. Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible." 339 U.S. 286, 287, 70 S.Ct. 631–632. "Proportional racial limitation is therefore forbidden. An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." 339 U.S. 287, 70 S.Ct. at 632. Chief Justice Vin-

son and Justices Black and Clark concurred in the opinion of Mr. Justice Reed. Justices Burton and Minton concurred in the opinion of Mr. Justice Frankfurter, who said: "It (the Constitution) does command that no State purposefully make jury service turn on color." 339 U.S. 291, 70 S.Ct. 634. "The basis of selection cannot consciously take color into account." 339 U.S. 295, 70 S.Ct. 636. Mr. Justice Clark, also concurring, recognized the holding that there must be no "purposeful systematic limitation of the number of Negroes on grand juries," 339 U.S. 296, 70 S.Ct. 636; and "that representation on the grand jury by race in proportion to population is not permissible for there must be 'neither inclusion nor exclusion because of race.'" 339 U.S. 298, 70 S.Ct. 637. Mr. Justice Jackson dissented on the ground that the defendant had not been harmed by the method of selection of the grand jury. 339 U.S. 305, 70 S.Ct. 629.

The main difference between this Collins case and the Cassell case is that in Cassell one Negro was purposefully placed on the list of sixteen from which the grand jury was selected, while in Collins six Negroes were purposefully placed on the list of twenty from which the grand jury was selected. In both instances, the basis of selection was race. That is the fatal defect.

The appellee's most serious apprehensions relate to the effect of our holding on the "general venire list" of three hundred persons. LSA–R.S. 15:-179. We recognized (see 329 F.2d 105) the affirmative constitutional duty resting upon the jury commissioners " * * not to pursue a course of conduct in the administration of their office which would operate to discriminate in the selection of jurors on racial grounds. Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are quali-

fied negroes available for jury service." Hill v. Texas, supra, 316 U.S. at 404, 62 S.Ct. at 1161, followed in Avery v. Georgia, 1953, 345 U.S. 559, 561, 73 S.Ct. 891, 97 L.Ed. 1244. We further recognize that "[o]ur duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty." Brown v. Allen, 1953, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469. Further, in United States ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, 67, we stated that "very decided variations in proportions of Negroes and whites on jury lists from racial proportions in the population, which variations are not explained and are long continued, furnish sufficient evidence of systematic exclusion of Negroes from jury service. Brown v. Allen, 1953, 344 U.S. 443, 471, 73 S.Ct. 397, 97 L.Ed. 469." Thus it may be that the "general venire list" of three hundred persons is required to reflect a suitable cross-section of the population, and that the jury commissioners have an affirmative duty to include qualified Negroes in that list. If such a requirement and duty have once been met in compiling the "general venire list" no repetition is necessary or even allowed in the selection of the list of twenty "therefrom." Certainly, as to the list of twenty, the basis of selection cannot consciously take race or color into account. There may be a very real distinction in this respect between the "general venire list" of three hundred and the "list of grand jurors" consisting of the names of twenty citizens selected "therefrom."

We limited our holding in the present case as follows: "The only list of importance to the decision of this case is the list of twenty from which the foreman was selected and the other eleven grand jurors drawn." 329 F.2d 105. The question of whether it would be a denial of equal protection of the laws to intentionally include names of persons selected

on the basis of individual qualifications and also on the basis of race in the "general venire list" of three hundred is not here before us and is not decided.

The appellee's second petition for rehearing is

Denied.

JONES, Circuit Judge (concurring specially).

Systematic inclusion of Negroes on a jury, as well as systematic exclusion, is in violation of the due process clause or the equal protection clause, or both. The representation of the respective races on juries must not be proportional, but too few of one race or too many of the other may be evidence of discrimination. The basis of selection cannot consciously take color into account yet, as Judge Rives so aptly says, that in the general venire list, it may be that "the jury commissioners have an affirmative duty to include qualified Negroes in that list." Thus it seems that perhaps Negroes must be included in the general venire list, although it will be assumed that this is not to be done purposefully lest the Constitution be infringed.

The systematic inclusion of Negroes on the grand jury which indicted Collins rendered the indictment and all subsequent proceedings invalid. No difficulty is anticipated in the selection of a grand jury to indict and a petit jury to try the appellant in compliance with the principles which the courts have announced.

BENJAMIN C. DAWKINS, Jr., District Judge (dissenting).

Originally I concurred in the majority opinion on grounds different from those therein expressed, with a footnote reserving grave doubts as to the soundness of the majority's views. To further clarify my position now, I attach a copy of the original opinion (Appendix A). As I noted therein, the majority decision now rendered indeed places jury commissioners, in both state and federal courts, in a virtually insoluble dilemma, where compilation of a constitutional jury list may be an impossibility. Furthermore,

it is directly contrary to the ruling of the United States Supreme Court in Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945).

In Akins the jury commissioners selected sixteen names and placed them on a list from which twelve grand jurors were chosen. The commissioners were instructed not to discriminate against Negroes, and in carrying out this instruction they intentionally selected *one* Negro and placed his name on the list of sixteen. Of course, in that case the contention was that there was discrimination because of the limitation of Negroes on the list to only one. The Court held that discrimination had not been proved.

The dissenting justices in Akins expressed their views in a manner almost exactly like that now adopted by the majority here. At page 410, 65 S.Ct. at page 1282 in his dissenting opinion Justice Murphy stated:

"* * * By limiting the number to one they thereby excluded the possibility that two or more Negroes might be among the persons qualified to serve. All those except the one Negro were required to be of white color. At the same time, by insisting upon one Negro, they foreclosed the possibility of choosing sixteen white men on the panel. They refused, in brief, to disregard the factor of color in selecting the jury personnel."

It is as apparent as apparency can be that the majority in the present case is reasoning as the minority did in the Akins case. For example, in the original opinion here, that has since been withdrawn, but now is disclosed by this dissent, the majority stated:

"The prohibition is often referred to as being against the systematic exclusion of Negroes from jury service because of their race or color. Systematic *in*clusion of any limited number of Negroes because of race means, however, a corresponding systematic exclusion of Negroes from the remaining number on the

venire. For example, while improbable, it is by no means impossible that a grand jury drawn from the general venire list of 300, assuming that list to be prepared without racial discrimination, might have contained more Negroes than the five who sat on the grand jury which indicted Collins."

And in the substituted opinion the majority states:

" * * * Six Negroes were deliberately included in this list of twenty because of their race. When to this circumstance is added the additional facts then known to the jury commissioners that the grand jury to be chosen from that list of twenty was to consider whether to return an indictment against Collins, and that no other case was scheduled to be considered by that grand jury, the conclusion becomes inescapable that in the organization of the grand jury which indicted Collins there was discrimination against him because of his race or color."

It is not mentioned at all that we were informed in oral argument, undisputed by appellant's counsel, that one of the six held a Ph. D. degree, and that the other five were successful businessmen or farmers—independent, reasonably educated men. They were not mere "Uncle Toms," who had any economic or physical compulsion against them, regardless of their actions as grand jurors.

In denying the second petition for rehearing, the majority has stated that the jury commission did not know that no other case would be referred to the grand jury, although it knew at the time of selection that only Collins's case then was pending. Thus the decision rests solely on the intentional *inclusion* of Negroes on the jury venire. Consequently, the opinion in effect holds that the intentional placing of the names of six Negroes on the list of twenty from which the grand jury was chosen discriminated against Collins, a Negro. What greater *non sequitur* can there be? Such a holding is precisely contrary to the ruling

by the Supreme Court in Akins v. Texas, supra. It cannot rationally be argued that the Court there did not consider the position now asserted by the majority, for the simple reason that the same contentions were advanced by the dissenting opinion in Akins and *rejected*.

The opinion by the majority (in which Judge Jones evinces a somewhat reluctant special concurrence) relies almost entirely—if not entirely—upon Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), where, in my opinion, loose language was used to the effect that: "An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither *inclusion* nor exclusion because of race." (Emphasis added.) In support of this conclusion, the following remark from Justice Frankfurter's concurring opinion is quoted: "The basis of selection cannot consciously take color into account."

A fair and profound analysis of Cassell will clearly show that the above quotations as to *inclusion* are purely *dicta*, nothing more or less. The Court stated that the reason for granting certiorari was " * * * to consider petitioner's claim that in this case Negroes were omitted from the list of grand jurymen either because of deliberate limitation by the Dallas County jury commissioners, or because of failure by the commissioners to acquaint themselves with available Negroes." In that part of the opinion in which the Court discussed the fact that proportional representation of races on a jury is not a constitutional requisite, it made the passing statement that there should be neither inclusion nor exclusion because of race.

*But* in the very next sentence, immediately following, the Court stated: "Our holding that there was discrimination in the selection of grand jurors in this case, however, is based on another ground." It then discussed in detail the failure of the jury commissioners to familiarize themselves with eligible jurors without regard to race. It was carefully emphasized that they admittedly knew members

of the white race, but since they had made no *conscious* effort to acquaint themselves with qualified Negroes and other minority groups they had used a system which resulted in racial discrimination and was unconstitutional. Whether or not intentional *inclusion* of Negroes would have been unconstitutional was not before the Court or involved in the case, and only mentioned in passing.

In Cassell there was no majority opinion as such, but a 4–3–1 split, with one justice not participating. See "The Supreme Court, 1949 Term," 64 Howard Law Rev. 127 (1950).

The slight weight to be given *dicta* is clearly stated in Cohens v. Virginia, 6 Wheat. 264, 399, 5 L.Ed. 257 (1821):

"The counsel for the defendant in error urge, in opposition to this rule of construction, some *dicta* of the court, in the case of Marbury v. Madison [1 Cranch 137, 2 L.Ed. 60]. It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

The actual holding in Cassell has been digested accurately in 31 Am.Jur., *verbo* Jury § 98, as follows: "Discrimination in selecting a jury on racial grounds means purposeful, systematic *noninclusion because of color or race.*" (Emphasis added.) The Supreme Court earlier stated the same rule in this manner:

"* * * What an accused is entitled to demand, under the Constitution of the United States, is that, in organizing the grand jury as well as in the empaneling of the petit jury, there shall be *no exclusion* of his race, and no discrimination against them, because of their race or color." Martin v. State of Texas, 200 U.S. 316, 321, 26 S.Ct. 338, 50 L.Ed. 497. (Emphasis added.)

If I am wrong in this analysis of Cassell, and I am convinced otherwise, then it would be logical to conclude that all juries, grand and petit, state and federal, which have been selected since that decision, throughout the nation, wherever significant racial or ethnic differences exist and where jury commissioners consciously and conscientiously have attempted to constitute jury lists on a nondiscriminatory, representative basis, then all indictments and convictions in such areas have been unconstitutional and invalid. This, I cannot believe the Supreme Court ever meant to be.

The Court first applied the Fourteenth Amendment to prohibit discrimination against Negroes in the selection of jurors in Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879). It then held that a State could confine the selection of jurors to males, to freeholders, to citizens, to persons within certain ages, or to persons meeting certain educational requirements. The Court recognized that the Fourteenth Amendment was designed primarily to make Negroes full citizens and as to the selection of juries Negroes were to be treated equally with whites.

At the same term, in Virginia v. Rives, 100 U.S. 313, 322–323, 25 L.Ed. 667, the Court stated, "It *is* a right to which every colored man is entitled, that, in the selection of jurors to pass upon his life, liberty or property, there shall be no *exclusion* of his race, and no discrimination against them because of their color." (Emphasis added.)

Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1880), reiterated the proposition that *exclusion* of Negroes from juries because of their race or color was unconstitutional. Over and over again,

the Supreme Court, in the last 80 years, has emphasized and re-emphasized the same rule concerning *exclusion* from jury lists because of race. Bush v. Kentucky, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354 (1883); In Re Wood, 140 U.S. 278, 11 S.Ct. 738, 35 L.Ed. 505 (1891); Gibson v. Mississippi, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075 (1896); Carter v. Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839 (1900); Rogers v. Alabama, 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417 (1904); Martin v. Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497 (1906); Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Hollins v. Oklahoma, 295 U.S. 394, 55 S.Ct. 784, 79 L.Ed. 1500, (1935); Hale v. Kentucky, 303 U.S. 613, 58 S.Ct. 753, 82 L.Ed. 1050 (1938); Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947); Brunson v. North Carolina, 333 U.S. 851, 68 S.Ct. 634, 92 L.Ed. 1132 (1948); Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Ross v. Texas, 341 U.S. 918, 71 S.Ct. 742, 95 L.Ed. 1352 (1951); Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Reece v. Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Coleman v. Alabama, 84 S.Ct. 1152 (1964).

In order to insure that there is no exclusion of persons because of their race, the Supreme Court has directed jury commissioners to make a *conscious* effort to select a jury composed of a *cross-section* of the community. In Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 416 (1953), Justice Reed, speaking for the majority, stated:

"Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, *so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty.*" (Emphasis added.)

In making their selection of prospective jurors commissioners *must,* indeed, are bound, to acquaint themselves with qualified members of all races and use a method which will insure selection from each major racial group. Hernandez v. Texas, supra; Cassell v. Texas, supra; Hill v. Texas, supra; Smith v. Texas, supra. In the latter case a unanimous court held: "Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who know no negroes as well as from commissioners who know but eliminate them." Thus it was ruled that a commissioner who knows no Negroes must make a *conscious* effort to learn of qualified Negroes and select some of them in order not to discriminate.

On May 30, 1962 (reh. den. June 29, 1962), in United States ex rel. Seals v. Wiman, 304 F.2d 53, at page 60, Judge Rives, the organ of the Court here, said:

"Prior to 1960, the Commissioners personally handed out the majority of the pink application cards (the remaining applicants came by the office), and they handed them out only one at a time to individuals whom they knew, although on one or two occasions Commissioner Allen thought he had asked a Negro minister for the names of qualified Negroes. The only sources of Negro applicants the Commissioners could name were the waiters at Morrison's Cafeteria, the Negroes working at the downtown hotels, those at the shoe shine parlors, mail carriers, and a few they came in contact with through business. Commissioner Allen noted that they often choose names from the rosters of various

organizations such as the Junior Chamber of Commerce or the Kiwanis Club. When asked if he had ever used the roster of a Negro club or association, he replied no, that no one had ever given him one. Both the Commissioners admitted that the bulk of their friends, social contacts, and acquaintances were white. *On the basis of this evidence we see no sufficient effort to solicit the names of qualified Negroes beyond the admittedly narrow circle of ordinary contacts of the Commissioners."* (Emphasis added.)

In Moore v. New York, 333 U.S. 565, 68 S.Ct. 705, 92 L.Ed. 881 (1948), the Court indicated that the record was devoid of proof of systematic, intentional and deliberate exclusion of Negroes from jury duty, and thus the conviction of Negro defendants was sustained. One jury commissioner testified that he must have interviewed at least 500 Negroes and accepted maybe two or three dozen. Obviously, therefore, there was a conscious effort to obtain members of the Negro race to serve on juries, and clearly, in the absence of this intentional inclusion of some Negroes, the Court surely would have found that there had been discrimination.

Another plainly apparent mistake in the majority's ruling here is that it does not explain adequately how intentional inclusion of Negroes on a grand jury could discriminate against a Negro accused. What evidence there is on the point tends to indicate that inclusion of six Negroes on the list substantially exceeded the proportion of Negroes in the parish. I already have alluded to the quality of the six. It surely is an unwarranted affront to such high type citizens of the Negro race to assume that they would discriminate against other members of their own race when serving upon a Grand Jury, in secret session, and requiring at least nine members to vote for an indictment. LSA–Constitution 1921, Article 7, § 42.

There has been no proof, nor proffer of proof, that substantially would establish that the jury commissioners purposely limited the number of Negroes placed on the grand jury venire. In fact, the evidence definitely shows that each commissioner acted separately, not knowing how many persons of each race would be placed on the list by the other commissioners. It is clear beyond dispute that in this case, if anything could be made clearer, this defendant was *benefited* by the intentional inclusion of Negroes, not discriminated against; and it must be remembered that he was indicted and convicted of a heinous crime—aggravated rape, which conviction was affirmed by the Louisiana Supreme Court. Moreover, the Supreme Court never has sustained a defendant's objection to exclusion of a group from jury service except when the defendant was a member of the excluded class, Fay v. New York, 332 U.S. 261, 287, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); and it *never* has voided an indictment or conviction for conscious *in*clusion of members of the same race or ethnic group.

The Court has directed States unequivocally not to *ex*clude Negroes intentionally from grand jury lists, and now the majority here directs States not to *in*clude them intentionally. To me, this fundamentally cannot follow and is impossible of accomplishment. Nevertheless, the Supreme Court repeatedly has upheld the right of States to use selection procedures not based solely on chance but designed to select *intelligent* and *morally fit* jurors. LSA–R.S. 15:172 (1950), among other things, requires jurors to be literate and of good character. *Ergo,* jury commissioners here and in all States, not only must know these things, but in learning of them must know their race. This is a *sine qua non.*

This simple question may be posed— and I believe there is only one inescapable answer to it—how can a constitutional jury be formed in either a state or federal court if jury commissioners do not intentionally include members of various races? This problem was recognized, at least partially, by Judge Jones

in his concurring opinion in which he agrees with Judge Rives that "it may be that 'the jury commissioners have an affirmative duty to include qualified Negroes in that list [the general venire list].' " But in the next sentence he seems to contradict himself when he states that "it will be assumed that this is not to be done purposefully lest the Constitution be infringed." With all respect, to me this is a *non sequitur* in light of the unbroken line of Supreme Court decisions (and of this Court, see Wiman, supra), holding that jury commissioners have an *affirmative* duty to seek out, and place on such lists, qualified Negroes.

Gibson, in Racial Discrimination on Grand Juries, 3 Baylor Law Rev. 29, 38–39 (1950), referring to certain language in the Cassell case, quite appropriately stated:

"*  *  *  the Court has disregarded the psychic nature of a prejudice—racial or otherwise. It is a sad fact, that notwithstanding the best and most noble efforts of all, our society discerns a difference between men on the basis of color. That prejudice can be rooted out only by stern combat within the minds of individual men. The rules of combat must be shaped by expanding and developing social institutions; the approaches to battle must be through those institutions; the motivation to attain and secure the objective must come from within those institutions. This end cannot be accomplished by the court's requirement of a process of selection of jurors which will make any ascertainable racial representation completely dependent upon chance. How can there be chance until there is open-mindedness? A prejudice exists. It will pass, men of good-will hope, with the passage of time, but there must be the conscious recognition of it, the regret for it, the desire to destroy it, and finally the taking of action to abolish it. The design will have to be there, but systematic approach has been outlawed.

If the Negro is systematically excluded, the Court condemns; if he is systematically included, the Court condemns. But the prejudice that has pointed out the Negro in the social system since before the founding of the Republic still points him out. All that can be done now is wrongfully to exclude him absolutely, or genuinely strive to give him equal share of that which is rightfully his. But the direction taken, and each step thereon, must be a *conscious* one. Where human discretion is a factor in selection, a general prejudice cannot be purged immediately and completely. The only way to counteract a prejudice is through a purposeful effort, which inevitably must take on a design. A prejudice can not merely be forgotten. It is a psychic force that must be met with a psychic force." (Emphasis added.)

To know whether a prospective juror is qualified, a jury commissioner or the person recommending him to the commissioner must know who he is. To know a man requires that his race be known. If the commissioner knows he must *not exclude* Negroes, then he consciously will attempt to include them. To do so does not violate equal protection of the laws, because whites are also intentionally included. Each race is treated equally. How else can the Supreme Court's positive mandates for jury selection from a reasonable cross-section of the community be met?

If the majority opinion held that there had been intentional inclusion of a token number of Negroes and that this discriminated against Collins, that would accord with the rationale of Cassell; but the facts here conclusively contra-indicate a mere token inclusion. This is a case where the jury commissioners unquestionably made a good-faith effort to place a representative cross-section of the community on the general venire and grand jury list. To hold that their action is unconstitutional because they knew which of these selected were whites

and which were Negroes, is totally unfounded in law and absolutely opposed to the Supreme Court rulings in Akins and Brown v. Allen, supra.

Upon original hearing, an erroneous interpretation was made by me of certain evidence in the transcript. Since that evidence was the basis of my special concurrence in the original opinion, it is appropriate to set forth the pertinent portions of the brief by the Louisiana Attorney General setting the record straight:

"Notwithstanding the fact that the Court expressly held that 'Even if the list of 20 had been selected from the general venire list, * * ' this would not change the decision, the fact remains that from page 5 of the opinion through the first paragraph of page 11, the Court attempts to make out a case for a finding that the twenty names selected for the grand jury venire were in addition to the list of 300 names on the general venire.

"In this connection, Your Honors will recall that no argument was ever made by anyone suggesting this interpretation of Mr. Arceneaux's testimony. If you would but ask attorneys for appellant they will readily affirm that you are in error. Surely you do not want to perpetuate an erroneous finding which has not been suggested nor defended by any counsel in this case.

"To understand Mr. Arceneaux's testimony, you should consider the requirements of the Louisiana law which were carefully followed by this Jury Commission. In 1958 these Jury Commissioners were appointed. The jury venire which had been made up by the previous Jury Commission was purged. Therefore, the new Jury Commission started with an entirely new list of 300 names. On the same day that this Jury Commission made up the list of 300 names, they were ordered to select 20 names from this venire to make up the grand jury venire.

In accordance with the further orders of the trial court, they proceeded that same day to draw by lot from the remaining 280 names a list of 40 names to serve for the criminal petit jury term of Court. Then they proceeded to draw by lot from the remaining 240 names a list of 35 names for the civil petit jury term of Court.

"Six months later the Jury Commission was ordered to meet and add to the remaining names on their original list which now contained only 205 names, so that the general venire list would have 300 names on it. Then in accordance with the trial court's order they proceeded to select 20 names for the grand jury venire. Then they drew by lot an additional 40 names for the criminal petit jury venire and they drew by lot an additional 35 names for the civil petit jury venire.

"This procedure was carried out each of the five times that they met prior to the time that they drew the venire which has been declared discriminatory by the Court's March 11th opinion.

"With this brief summary of the Jury Commission's method of selecting jury venires, it is readily apparent that the testimony of Mr. Arceneaux to the effect that the grand jury venire of 20 names was selected from 'the additions to the 300' means simply that the names selected for grand jury duty were not taken from the 1958 list. Instead the grand jury venire was taken from those names added to the 1958 list, which 1958 list had been depleted because of the removal of those names drawn or selected for the various juries drawn since 1958. The additions to the 1958 list had to be made so that each selection and drawing could be made, in accordance with the law, from a list of 300 names.

"At no point did Mr. Arceneaux or anyone else say that the list of

20 names selected for the grand jury was 'in addition' to the list of 300 names which make up the general venire.

"On page 10 of the opinion of March 11, 1964, [329 F.2d 100 at page 104], the Court states 'Appellee concedes that Mr. Arceneaux so testified, * * *.' Our supplemental brief signed by us on January 3, 1964 is subject to this interpretation, for on page 4 of our brief at the outset of paragraph numbered 'V.' we stated—'If the grand jury had actually been selected according to Mr. Arceneaux's version, * * *' etc. It was not our intention to so concede and what we meant to say was—'If the Grand Jury venire had actually been selected according to the Court's interpretation of Mr. Arceneaux's version, * * *' etc. The plain and obvious fact is that Mr. Arceneaux's testimony did not mean what the Court held that it meant. And we respectfully pray that the Court correct this error."

It should be noted also that in the absence of evidence to the contrary, there is a presumption that officers in charge of the selection of a jury panel have performed their duty lawfully. Tarrance v. Florida, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572 (1903). See Anno. 1 A.L.R. 2d 1291, 1296 (1948). The *proces verbal,* an official record of the State Court, as to the procedure here employed by the jury commission, clearly refutes the incorrect inferences I drew, and the majority now draws, from the testimony of the Commissioners.

It is interesting to note that the Judicial Conference of the United States has suggested that the letter to key-men who suggest prospective jurors for federal jury service include the following statement: "In making up this list, *we ask that you make a conscious effort to include* both men and women *from a variety of backgrounds* and occupations so as to give us, as nearly as possible, *a representative cross-section of your community.*" (Emphasis added.) 267 F.R.D. 409, 514 (1960).

For these reasons I hereby withdraw my former special concurrence in the original opinion, my concurrence in the second opinion, and I respectfully dissent from the denial of the second petition for rehearing.

I consider it my duty, notwithstanding my lesser official position, insofar as the majority is constituted, to "stand up and be heard" on this grave constitutional question. Hence I render this dissent with all the sincerity I possess.

### ADDENDUM TO DISSENT

BENJAMIN C. DAWKINS, Jr., District Judge.

Since the above dissenting opinion was written, and forwarded to Judge Rives for filing and printing, I have been advised that the Louisiana Legislature unanimously has passed its Act No. 161 of 1964, approved by the Governor, and, under the Constitution of this State, to become a part of its statutory laws on July 29, 1964, reading as follows:

"LEGISLATURE OF LOUISIANA ACT NO. 161 OF 1964

"To amend and re-enact as amended Section 180 of Title 15 of the Louisiana Revised Statutes of 1950, and to repeal all laws in conflict therewith.

"BE IT ENACTED BY THE LEGISLATURE OF LOUISIANA:

"Section 1. Section 180 of Title 15 of the Revised Statutes of 1950 be amended and reenacted as follows:

"SECTION 180—SELECTION OF GRAND JURIES.

"Immediately after completing the general venire list, the commission shall select by drawing indiscriminately and by lot therefrom the names of twenty citizens, possessing the qualifications of grand jurors, who shall be subject to duty as grand jurors during the term of six months after

the grand jury is empaneled and until a succeeding grand jury shall have been empaneled.

"The names of the persons so selected shall be written or type-written on slips of paper, with no designation as to race or color, in the presence of the commissioners and they shall place the slips in an envelope, seal the same and endorse thereon the words 'List of Grand Jurors.'

"Section 2. All laws or parts of laws inconsistent and in conflict herewith are hereby repealed.

"Unanimously adopted by the House of Representatives and Senate of the Louisiana Legislature, and approved by the Governor, July 4, 1964."

To me, this clearly cures the gross constitutional mistake created by the majority opinion from which I still vigorously dissent. Moreover, it sets an optimum example of which both State and Federal courts throughout the nation might well take heed, in light of what I respectfully consider to be an impractical, impossible, indeed, wholly unjustifiable ruling by the majority, which flies directly into the teeth of the Supreme Court's prior mandates.

## APPENDIX A.
### IN THE
### UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

### No. 20537

WOODMAN J. COLLINS,
Appellant,
versus
VICTOR G. WALKER, Warden, Louisiana State Penitentiary, Angola, Louisiana,
Appellee.

Appeal from the United States District Court for the Eastern District of Louisiana.

(December 6, 1963.)

Before RIVES and JONES, Circuit Judges, and BENJAMIN C. DAWKINS, Jr., District Judge.

RIVES, Circuit Judge.

Collins, a Negro, was convicted and sentenced to death under an indictment charging him with aggravated rape upon a white woman. The conviction and death sentence were affirmed by the Supreme Court of Louisiana. State v. Collins, 1962, 242 La. 704, 138 So.2d 546, 547. Certiorari to the Supreme Court of the United States was denied, 371 U.S. 843, 83 S.Ct. 74, 9 L.Ed.2d 79.

His petition for habeas corpus to the United States District Court claimed that his conviction was violative of the Constitution of the United States in three respects: 1) He was discriminated against because of his race or color in the organization of the grand jury which indicted him; 2) he was mentally unable to stand trial, an imbecile not able to assist counsel in his defense; 3) his conviction was procured in part by an unconstitutionally coerced confession.

Each of these contentions had been raised and decided against him upon his trial and upon appeal to the State Supreme Court. It is therefore properly conceded that he has satisfied the requirement of 28 U.S.C.A. § 2254, that state remedies be exhausted before a federal court may grant an application for habeas corpus. 28 U.S.C.A. § 2254; Brown v. Allen, 1953, 344 U.S. 443, 447–450, 73 S.Ct. 397, 97 L.Ed. 469; Fay v. Noia, 1963, 372 U.S. 391, 426 et seq., 83 S.Ct. 822, 9 L.Ed.2d 837.

At the request of the district court, a copy of the record and transcript of proceedings in the State courts was presented and filed with the district court. Upon the basis of that record and transcript, and without taking additional evidence, the district court denied the application for habeas corpus. Collins v. Walker, E.D.La.1963, 215 F.Supp. 805. Thereafter, the district judge issued a certificate of probable cause in accordance with 28 U.S.C.A. § 2253, and per-

mitted the prosecution of this appeal in forma pauperis.

It is settled that a federal district court may, in its discretion, refuse the writ of habeas corpus without hearing additional evidence, if the court is satisfied, by an examination of the record and proceedings in the State court, that the issues have been adequately litigated, that the state process has given fair consideration to the issues and the evidence, and has resulted in a legally satisfactory conclusion, and that no unusual circumstances calling for a hearing are presented. Brown v. Allen, supra, 344 U.S. at 463, 73 S.Ct. 397. The Supreme Court has, however, recently emphasized that, "Even if the state court adjudication turns wholly on primary, historical facts, the Federal District Court has a broad *power* on habeas to hold an evidentiary hearing and determine the facts." Fay v. Noia, supra, 372 U.S. at 422, 83 S.Ct. at 840. The Supreme Court in Townsend v. Sain, 1963, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770, set forth the tests with more particularity:

"We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing."

On the first question, that of racially discriminatory organization of the grand jury, we agree with the district court that the evidence introduced in the state court proceedings was adequate, indeed undisputed, but we reach a conclusion opposite to that reached by the state courts and by the district court.

1) Indictment is the only method provided by the law of Louisiana for the institution of the prosecution of a capital offense. LSA–R.S. Title 15, § 2. A jury commission for each parish is selected and appointed by the district judge. LSA–R.S. 15:175. At the time ordered by the district judge, the jury commission meets at the office of the clerk of the district court and selects from the persons qualified to serve as jurors for their parish three hundred persons as the "general venire list." LSA–R.S. 15:179. The next section provides the method of selecting a grand jury.

"§ 180. *Selection of grand jury*

"Immediately after completing the general venire list, the commission shall select *therefrom* the names of twenty citizens, possessing the qualifications of grand jurors, to be taken from different portions of the parish, as far as practicable, who shall be subject to duty as grand jurors during the term of six months after the grand jury is impaneled and until a succeeding grand jury shall have been impaneled.

"The names of the persons so selected shall be written on slips of paper, by the clerk, in the presence of the commissioners and they shall place the slips in an envelope, seal the same and indorse thereon the words: 'List of Grand Jurors.'" (Emphasis supplied.)

Negroes constitute a substantial proportion of the population of Jefferson Davis Parish. Mr. Arceneaux, the member of the Jury Commission from Ward 2, testified that the population in that ward was about 75% white and 25% Negro, that being the "heaviest concentration of colored people in Jefferson Davis Parish."

Mr. Arceneaux had served on the Jury Commission since 1958. In that year the Jury Commission prepared the original "general venire list" of 300 persons.

"Q. Would you tell the court what sort of instructions you were given and who gave them to you?

"A. When we were appointed on the Committee we were given instructions as to who was eligible and ineligible for jury duty by written instructions from the Judge. We have been from time to time reminded by the Judge that in picking the jury to just be careful that there should be both white and colored members on the jury. Other than this I would say we've had no instructions."

Some Negroes were included in this original list of 300 but Mr. Arceneaux did not recall how many. "We have met twice annually for the choosing of additional names to add to the lst (sic) to replace the juries that have been drawn out of that original list."

Mr. Arceneaux further testified:

"Q. Now, have there been three grand and petit juries drawn from this list since it was prepared?

"A. From that list, no.

"Q. How many have been drawn or do you know?

"A. I think there would have been five grand juries drawn since we've been on. It's either four or five.

"Q. Now, Mr. Arceneaux—

"A. They are not taken from that list of three hundred.

"Q. Sir?

"A. That grand jury was not picked out of that original group of three hundred.

"Q. It was not?

"A. No.

"Q. How was that—

"A. The grand jury is picked by names in the additions to the three hundred.

"Q. In additions to the three hundred?

"A. Correct."

Again Mr. Arceneaux testified:

"Q. Do you have any idea how many colored people are presently in the venire list of three hundred?

"A. That would be a hard question to answer. I don't know I could even give an estimate because we have drawn a lot of the original names and it would be hard—well, it would be impossible for any individual member of the Commission to say, because the names when they are submitted are not submitted as colored or white, they're submitted as names and we know in our selection what they are but when they are put in the box there is no way in distinguishing between them.

"Q. But when you do draw the grand jury out you do know whether they are colored or white?

"A. The grand jury is named before the names are put in the box, yes, we do know whether they are colored or white.

"Q. Now, as I understand it, when you prepare the grand jury you don't look in the box of three hundred and select out twenty names? You simply get together and you all select twenty names, period, and put them on there. Is that right?

"A. That's correct."

As each grand jury was selected, the Jury Commission was instructed by Mr. Charles A. Pitre, the Clerk of the District Court, that some Negroes should be included. As Mr. Arceneaux testified:

"A. That instruction, each time that we had met, has come from Mr. Pitre that there should be some colored representation on each grand jury.

"Q. I see.

"A. But not any specific instructions other than that we should attempt to do that each time."

At the time of Collins' arrest on April 8, 1960, there had been recently empaneled for Jefferson Davis Parish a regular grand jury for the six months commencing March 21, 1960. There was no Negro on that grand jury for the reason thus stated by Mr. Arceneaux:

"Q. Now do you know what reason why you did not put any on the grand jury immediately prior to the grand jury under which this man was indicted?

"A. I had put some on the previous and I was depending on some one else to put someone on the previous grand jury and in the course of events when we finished putting the names in it turned out that all of us had depended on someone else putting the names in and it so happened none of us did."

Mr. Arceneaux further testified:

"Q. Now, Mr. Arceneaux, how many Negroes did you put on the grand jury panel or the twenty names prior to this particular one and prior to the one that you failed to put anyone on? About how many had you—

"A. I think that I had always put at least one on the grand jury panel on all of the grand juries that have been selected except

the one immediately preceeding (sic) the present grand jury."

Collins' case was not presented to the grand jury empaneled when he was arrested, but instead he was held in jail for six months until October 5, 1960, at which time six Negroes were purposely placed on the list of twenty names,[1] from which the district judge drew a grand jury composed of five Negroes and seven whites.

It was this grand jury which indicted Collins for aggravated rape and also for aggravated kidnapping and attempted murder. No other case was presented to this grand jury.

The State's position was that, instead of systematic *exclusion* of Negroes from the grand jury which returned the indictment, there was a purposeful *inclusion* of Negroes. As said by the State trial judge: "It seems entirely reasonable to this Court that the Jury Commission in noting its error of failing to have any Negroes on a Grand Jury did attempt to remedy this error by placing more Negroes on the subsequent Grand Jury."

The Louisiana Supreme Court held that this method of selecting a grand jury did not offend the Constitution of the United States, and quoted from its previous holding in State v. Green, 1952, 221 La. 713, 60 So.2d 208, 212, as follows:

" 'It would be fallacious, we think, to hold that, because jury commissioners, being conscious of the necessity of giving consideration to mem-

---

1. Mr. Strohe, the member of the Jury Commission from Wards 6 and 7, testified that there were very few Negroes in Ward 7, but about 30% of the population of Ward 6 was colored. He further testified:

"Q. * * * Now, do you recall how many Negroes were put on the grand jury venire of twenty names which is the present grand jury?

"A. Actually of the five of us we have our Wards designated and we feel responsible for those particular Wards, and to say exactly how many was put on, I wouldn't know

but I can speak for myself for 6 and 7.

"Q. Well how many were put on from 6 and 7?

"A. I think one from 6 and none from 7. * * *"

Mr. Johnnie Robert Benoit, the Jury Commission member representing Wards 5, 8 and 9, testified that on the list of 20 names from which the court drew the grand jury which indicted Collins:

"Q. And how many did you put on?

"A. I put two white man (sic) and one negro which I figured was fair to this man."

bers of the colored race, as well as those of other races, in the selection of all juries in order to comply with the guarantees of the Fourteenth Amendment to the Federal Constitution, have purposely included Negroes on a jury panel, their forthright action constitutes discrimination in the absence of a showing that there was a planned limitation upon the number of Negroes to be chosen.' (221 La. at 726, 60 So.2d at 212.)"

State v. Collins, supra, 138 So.2d at 551.

We do not agree. In the Green case, the Louisiana Supreme Court attempted to distinguish the case of Cassell v. Texas, 1950, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (see 60 So.2d at 212). In the instant case, the federal district judge held the Cassell case not applicable on its facts (215 F.Supp. at 809). While we would concede that the Cassell case is distinguishable on its facts, it is important to note that the Supreme Court, in its opinion, carefully stated the principle that: "An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." 339 U.S. at 287, 70 S.Ct. at 632.

That the use of this language was deliberate and well studied is shown by the concurring opinion of Mr. Justice Frankfurter:

"The prohibition of the Constitution against discrimination because of color does not require in and of itself the presence of a Negro on a jury. But neither is it satisfied by Negro representation arbitrarily limited to one. It is not a question of presence on a grand jury nor absence from it. *The basis of selection cannot consciously take color into account.*" (Emphasis supplied.)

339 U.S. at 295, 70 S.Ct. at 635–636.

On principle, we think that must be true. A Negro is entitled to the equal protection of the laws, no less and no more. He stands equal before the law, and is viewed by the law as a person, not as a Negro. In the historic language of the elder Mr. Justice Harlan:

"There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved."

Plessy v. Ferguson, 1896, 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256.

An accused cannot demand a mixed grand jury, some of which shall be of his same race. What an acccused is entitled to demand under the Constitution is that in organizing the grand jury there shall be no discrimination against him because of his race or color. Martin v. Texas, 1906, 200 U.S. 316, 321, 26 S.Ct. 338, 50 L.Ed. 497.

The Supreme Court has frowned on the use of white tickets to indicate prospective white jurors and yellow tickets to indicate Negroes.

"Petitioner's charge of discrimination in the jury selection in this case springs from the Jury Commissioners' use of white and yellow tickets. Obviously that practice makes it easier for those to discriminate who are of a mind to discriminate."

Avery v. Georgia, 1953, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244.

State courts and jury commissions may find somewhat contradictory or confusing the doctrine forbidding the consideration of color as a basis for selecting a venire of jurors and the rule which we stated in United States ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, 67, that "very decided variations in proportions of Negroes and whites on jury lists from racial proportions in the population, which variations are not explained and are long continued, furnish sufficient evi-

dence of systematic exclusion of Negroes from jury service. Brown v. Allen, 1953, 344 U.S. 443, 471, 73 S.Ct. 397, 97 L.Ed. 469." The reconciliation lies in the observance of the positive, affirmative duty resting upon jury commissioners and other public officials expressed in Avery v. Georgia, supra, 345 U.S. 559, 561, 73 S.Ct. 891:

> "The Jury Commissioners, and the other officials responsible for the selection of this panel, were under a constitutional duty to follow a procedure—'a course of conduct'— which would not 'operate to discriminate in the selection of jurors on racial grounds.' Hill v. State of Texas, 1942, 316 U.S. 400, 404 [62 S.Ct. 1159, 1161, 86 L.Ed. 1559]."

Also quoted in United States ex rel. Seals v. Wiman, supra, 304 F.2d at 66.

Compliance with that duty inevitably results in meeting the evidentiary test prescribed in United States ex rel. Seals v. Wiman, supra. The two rules may appear conflicting or confusing when attention is focused on the evidentiary test, but not when there is a good faith effort to comply with the constitutional mandate for which that test is prescribed.

The prohibition is often referred to as being against the systematic exclusion of Negroes from jury service because of their race or color. Systematic *inclusion* of any limited number of Negroes because of race means, however, a corresponding systematic exclusion of Negroes from the remaining number on the venire. For example, while improbable, it is by no means impossible that a grand jury drawn from the general venire list of 300, assuming that list to be prepared without racial discrimination, might have contained more Negroes than the five who sat on the grand jury which indicted Collins.

An opposite and somewhat paradoxical consideration is that the conscious taking into account of race or color as a basis of jury selection may result in injury from the sometimes over-ready complaisance of members of the race of the accused. To paraphrase the language of Mr. Justice Jackson, concurring in the result in Shepherd v. State of Florida, 1951, 341 U.S. 50, 55, 71 S.Ct. 549, 551, 95 L.Ed. 740: "I do not see, as a practical matter, how any Negro on the grand jury would have dared to vote against indicting Collins for a capital offense. The only chance Collins had may have been in the courage and decency of some sturdy and forthright white person of sufficient standing to face and live down the odium among his white neighbors that such a vote, if required, would have brought." Any effort to give to the accused more than the equal protection of the laws may thus well have the practical result of giving somewhat less than equal protection.

Moreover, it is important to note that the guarantee of the Constitution is to "the equal protection *of the laws.*" In the four or five grand juries drawn for Jefferson Davis Parish since 1958, the jury commissioners had made no pretense of selecting the names of twenty citizens *from* the general venire list as required by law. LSA–R.S. 15:180, quoted supra [335 F.2d p. 430]. Instead, the commissioners each placed in the list of twenty the names of such Negroes from the Parish at large as "I figured was fair to this man."[2] No matter how benevolent and well-intentioned the jury commissioners may have been, the accused cannot be required to accept their individual sense of fairness in the place of the equal protection *of the laws* to which he is entitled.

We conclude that in the organization of the grand jury which indicted Collins, there was discrimination against him because of his race or color.

Since the judgment of the district court must be reversed and the cause remanded to await a possible reindictment and retrial of Collins, it is not absolutely necessary to decide the other two questions presented by this appeal. True, those questions will probably arise on

2. Testimony of Jury Commissioner Benoit at record p. 153.

any subsequent retrial of Collins. Hence, sound judicial administration would ordinarily require that they be considered on this appeal. The difficulty, however, is that, in our opinion, the record is not adequate for their determination. We think that, under the principles heretofore stated [335 F.2d p. 430], the district court erred in not affording Collins an evidentiary hearing on those two questions.

Perhaps the most important factual consideration upon which each of those questions must be determined is Collins' mental capacity. Dr. Charles E. Sturm, the psychiatrist in charge of the State Criminal Colony at the State Hospital in Jackson, Louisiana, when first introduced as a witness, testified that, accepting the three classifications of moron, imbecile and idiot, he would classify Collins as an imbecile with a mental age range in the vicinity of ten to twelve; that Collins had an I.Q. of 63 (R. p. 170); and that "His performance would seem to indicate a chronic brain syndrome" (R. p. 176).

Dr. Sturm later testified that in stating Collins' I.Q. as 63, which would be feeble-minded (R. p. 347), he had relied on a report from a psychologist to whom he had sent Collins for an I.Q. test, a Mr. Lockridge, and that "He has said that that is not right. He's told me that today. He has said that it should be something in the vicinity of 80. Now, if that is true, your guess is just as good as mine."

Dr. Sturm further testified that a Dr. S. L. Pollock of New Orleans had made a neurological and psychological examination of Collins which "ruled out" a chronic brain syndrome (R. p. 361). Based upon the reports of Dr. Pollock and Mr. Lockridge, Dr. Sturm changed his opinion, and testified:

"He [Dr. Pollock] said that the neurological examination was completely within normal limits and he found no evidence of a chronic brain syndrome. Now, when we got that report, Mr. Lockridge changed his mind. Considering the changing of

his mind the IQ went up. So where, in his opinion, it should be in the vicinity of 80 instead of 63. And because the IQ went up to 80 I'll say that he is not a mental defective case now. He's just an uneducated colored boy."

Neither Mr. Lockridge nor Dr. Pollock testified on the trial in the State court. Their testimony appears only by way of hearsay. The State trial judge commented:

"Defense counsel did not object to this hearsay information. At the time of the trial Defense Counsel asked to have Mr. Lockridge subpoenaed for the trial of the case. Mr. Lockridge was subpoenaed and was sequestered for two days as a witness during the trial. However, it developed that Mr. Lockridge's re-examination disclosed that Woodman J. Collins had a substantially higher I.Q. that (sic) the first test indicated. It is perhaps for that reason that the defendant's counsel did not see fit to call Mr. Lockridge and he was released without testifying."

The federal district court should not have relied upon such a record, particularly in a case involving the ultimate issue of life or death. To hold Collins to the ordinary rules of an adversary trial in failing to call Mr. Lockridge as a witness seems to us, in effect, to prejudge Collins' mental capacity to stand trial.

The present record being so totally inadequate, we forego a decision on the other two questions presented by this appeal.

Notwithstanding our holding that the indictment against Collins is unconstitutional and void, Collins is now legally detained upon his commitment to await the action of another grand jury. Collins is, of course, entitled to be tried within a reasonable time, and the district court should retain jurisdiction to meet the unlikely event that further orders and judgments may be necessary or proper.

This Court expresses its present opinion that a period of eight months from and after the entry of this judgment or its final test by certiorari, or otherwise, will be sufficient to afford the State of Louisiana an opportunity to take the necessary steps to reindict and retry Collins.

Any such reindictment must of course be by a grand jury from which Negroes have been neither systematically excluded nor included. For the guidance of the parties, the Court expresses the present opinion that if Collins is reindicted and retried and if any question should arise as to the legality or constitutionality of such indictment or trial, that should be decided not upon the present petition but in the regular course by the Courts of the State of Louisiana, subject to possible review by the Supreme Court of the United States or upon other habeas corpus proceedings.

The judgment of the district court is reversed, judgment here rendered in accordance with the holdings of this opinion, and the cause remanded for any further proceedings which may be found necessary or proper.

Reversed, rendered, and remanded.

BENJAMIN C. DAWKINS, Jr., District Judge (concurring specially).

I concur in the result reached by the majority here, but respectfully base my action upon different grounds.

Since at least 1837, when the Supreme Court decided Charles River Bridge v. Warren Bridge, 11 Pet. 420, 553, 9 L.Ed. 773, in an unbroken line of cases, that Court has refused to consider constitutional questions when the record discloses other grounds for decision, whether or not they properly were raised by the parties. Some of the later cases reiterating this fundamental principle of judicial action are Rescue Army v. Municipal Court, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947) (which at 331 U.S. 568–575, 67 S.Ct. 1419–1423 sets forth all of the cogent reasons for this policy); Peters v. Hobby, 349 U.S. 331, at 338, 75 S.Ct. 790, 99 L.Ed. 1129 (1955); Neese v. So. Ry. Co., 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955); Clay v. Sun Insurance Office, 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960) vacating judgment at 265 F.2d 522 (5 Cir.); and, most recently, Bush v. Texas, 372 U.S. 586, at 590, 83 S.Ct. 922, 9 L.Ed.2d 958, (decided March 25, 1963).

In at least two decisions by this Court in recent years, this principle has been followed: Byers v. Byers, 5 Cir., 254 F.2d 205 (1958); and Lone Star Import, Inc. v. Citroen Cars Corp., 5 Cir., 288 F.2d 69 (1961), where it was said:

"* * * Whatever may be the temptations—or the inability to resist them—in adjudicating ordinary matters either of fact or statutory construction courts are especially cautioned against the determination of constitutional questions not inescapably presented where some other basis less profound is actually available as a ground of disposition. * * *"

Here, although mentioned in passing, and not the basis for the majority opinion, reference has been made to a simple *legal* ground upon which I think we ought to decree the nullity of the indictment under which appellant was convicted, without reaching the constitutional question.

LSA–R.S. 15:180 provides the method by which State grand juries shall be drawn:

"Immediately after completing the general venire list, the commission *shall* select *therefrom* the names of twenty citizens, possessing the qualifications of grand jurors, to be taken from different portions of the parish, as far as practicable, who shall be subject to duty as grand jurors during the term of six months after the grand jury is impaneled and until a succeeding grand jury shall have been impaneled.

"The names of the persons so selected shall be written on slips of paper, by the clerk, in the presence of the commissioners and they shall place the slips in an envelope, seal

the same and indorse thereon the words: 'List of Grand Jurors.'" (Emphasis supplied.)

It is to be noted that this statute expressly provides that the jury commission "shall" select the twenty persons from which the grand jury is drawn from the "general venire list" of 300 persons, provided for by LSA–R.S. 15:-179. The word "shall" is mandatory, as so used. The Louisiana Supreme Court has held in two cases that where the Legislature, in establishing the method by which grand juries are to be drawn, uses the word "shall," such is mandatory, not merely directory, language; and if not followed literally, any indictments returned by such illegally constituted bodies are absolute nullities. State v. Kifer, 186 La. 674, 173 So. 169, 110

A.L.R. 1017 (1937) and State v. McLean, 211 La. 413, 30 So.2d 187 (1947).

In this case, as pointed out by the majority opinion, the jury commissioners violated the express, mandatory requirement of the statute in *not* selecting the 20 names from the "general venire list." Instead they selected the names of 20 persons in addition to the three hundred on the general list. Therefore, having violated the State law, in my opinion, and according to the Louisiana jurisprudence, this indictment was a nullity. It is on that basis—and that alone—that I respectfully, and with full deference to the majority, submit that we should base our ruling. It is a mistake, I feel, that the constitutional question is considered at all; and it is my further opinion, without elaborating,* that the majority

---

\* It is difficult, indeed, to reconcile this Court's present holding that there constitutionally can be no "conscious inclusion" of Negroes on jury lists with earlier statements by the Supreme Court, *and by this Court.*

In Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942), then Chief Justice Stone, speaking for a unanimous Court, made the following statement at 316 U.S. 404, 62 S.Ct.:

"We think petitioner made out a prima facie case, which the state failed to meet, of racial discrimination in the selection of grand jurors which the equal protection clause forbids. As we pointed out in Smith v. Texas, supra, 311 U.S. 131 [61 S.Ct. 165, 85 L.Ed. 84], chance or accident could hardly have accounted for the continuous omission of negroes from the grand jury lists for so long a period as sixteen years or more. *The jury commissioners, although the matter was discussed by them, consciously omitted to place the name of any negro on the jury list. They made no effort to ascertain whether there were within the county members of the colored race qualified to serve as jurors, and if so who they were. They thus failed to perform their constitutional duty—recognized by § 4 of the Civil Rights Act of March 1, 1875, 8 U.S.C. § 44, 8 U.S.C.A. § 44 and fully established since the decision in 1881 of Neal v. Delaware, supra—not to pursue a course of conduct in the administration of their office which would*

*operate to discriminate in the selection of jurors on racial grounds. Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are qualified negroes available for jury service.* * * *" (Emphasis added.)

On May 30, 1962 (reh. den. June 29, 1962), in United States v. Wiman, 304 F.2d 53, at page 60, said:

"Prior to 1960, the Commissioners personally handed out the majority of the pink application cards (the remaining applicants came by the office), and they handed them out only one at a time to individuals whom they knew, although on one or two occasions Commissioner Allen thought he had asked a Negro minister for the names of qualified Negroes. The only sources of Negro applicants the Commissioners could name were the waiters at Morrison's Cafeteria, the Negroes working at the downtown hotels, those at the shoe shine parlors, mail carriers, and a few they came in contact with through business. Commissioner Allen noted that they often choose names from the rosters of various organizations such as the Junior Chamber of Commerce or the Kiwanis Club. When asked if he had ever used the roster of a Negro club or association, he replied no, that no one had ever given him one. Both the

is basing its constitutional ruling upon dicta in Cassell, since that case involved systematic *ex*clusion, not *in*clusion of Negroes.

Otherwise, I fully agree with what the majority has said, and hereby enter my special concurrence.

Commissioners admitted that the bulk of their friends, social contacts, and acquaintances were white. *On the basis of this evidence we see no sufficient effort to solicit the names of qualified Negroes beyond the admittedly narrow circle of ordinary con-* *tacts of the Commissioners."* (Emphasis added.)

To say the least, jury commissioners are being placed in a virtually insoluble dilemma, where a constitutional jury-list may be an impossibility.