## MOORE ET AL. *v.* NEW YORK.

No. 485.  Argued February 12, 1948.—Decided March 29, 1948.

*John F. Wilkinson* argued the cause for petitioners. With him on the brief was *Isidore Ehrman.*

*George Tilzer* argued the cause for respondent.  With him on the brief was *Samuel J. Foley.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

Petitioners were indicted in Bronx County, New York, on February 11, 1947, for the crime of murder in the first degree.  The District Attorney moved the court for an order that the trial be by a special jury, pursuant to New York law, which motion was granted over opposition on behalf of defendants by assigned counsel.  One hundred and fifty names were drawn from the special jury panel,

under supervision of a Justice of the State Supreme Court, in the presence of defendants' counsel and without objection.

When the case was called for trial defendants, as permitted by the state practice, served a written challenge to the panel of jurors upon the following grounds:

1. That § 749–aa of the Judiciary Law of the State of New York is in violation of § 1 of the Fourteenth Amendment to the Constitution of the United States.

2. That qualified Negro jurors were improperly excluded from the list of special jurors, from which said jury panel was drawn.

3. That qualified women jurors were improperly excluded from the list of special jurors, from which said jury panel was drawn.

After full hearing, the challenge was disallowed and petitioners were tried and convicted. On appeal to the Court of Appeals, the third ground of challenge to the jury panel was abandoned and the convictions were affirmed. 297 N. Y. 734, 77 N. E. 2d 25. We granted certiorari on a petition raising the remaining grounds. 332 U. S. 843.

The constitutionality of the New York special jury statutes has but recently been sustained by this Court, *Fay* v. *New York*, 332 U. S. 261, against a better supported challenge than is here presented, and the issue warrants little discussion at this time.

Some effort is made by statistics to differentiate this case from the precedent one as to the ratio of convictions before special juries contrasted with that before ordinary juries. The defendants present to us a study from July 1, 1937, to June 30, 1946, which indicates that special juries in Bronx County returned 15 convictions and 4 acquittals

during the period and concludes that the special jury convicted in 79% of the cases while the general juries convicted in 57%. The District Attorney responds that in 5 of these 19 cases, the special jury returned conviction in a lesser degree than that charged and, hence in 9 out of 19 cases withheld all or part of what the State asked. Moreover, it is said that all but two were capital cases, another was for manslaughter and one for criminally receiving stolen property. It should be observed that the number of cases involved in these statements is too small to afford a secure basis for generalizing as to the convicting propensities of the two jury panels, even if the cases were comparable. But it appears that in Bronx County a system of special and intensive investigation is applied to capital cases from the moment they are reported, more careful preparation is given them and they are tried by the most experienced prosecutors. This makes this class of cases not fairly comparable with the run-of-the-mill cases, felony and misdemeanor, that are included in the ordinary jury statistics. Moreover, none of these facts were laid before the trial court, which was in the best position to analyze, supplement or interpret them. We think on this part of the challenge no question is presented that was not disposed of in *Fay* v. *New York, supra.* Indeed, on opening the hearing on defendants' challenge the trial court said, "I understand the inquiry now is to be directed to the intentional elimination or disqualification of women and Negroes on the special jury panel." Counsel for both defendants assented to this definition of the issues and no evidence on other subjects was offered.

Petitioners' remaining point is that "the trial of the petitioners, Negroes, by a jury selected from a panel from which Negroes were systematically, intentionally and deliberately excluded, denied petitioners the equal protec-

tion of law and due process of law guaranteed them by the Constitution of the United States." If the evidence supported the assumption of fact included in this statement, the point would be of compelling merit. The law on this subject is now so settled that we no longer find it necessary to write out expositions of the Constitution in this regard. See *Brunson* v. *North Carolina,* 333 U. S. 851, decided March 15, 1948.

It is admitted that on this panel of one hundred and fifty there were no Negroes. But not only is the record wanting in proof of intentional and systematic exclusion— the only witnesses sworn testified that there was no such practice or intent. Nothing in the background facts discredits this testimony. The census figures give a proportion of Negro-to-white population in that county of .7% in 1920, 1.0% in 1930, and 1.7% in 1940. It is admitted that since the last census the Negro population has considerably increased. According to one estimate, the number of colored inhabitants, which in 1940 was 24,892, has increased to 192,066 in 1948. The same estimator later revised the figures to between 65,000 and 70,000. Neither estimate was before the trial court, and no evidence or finding gives us judicially approved data. Of course, new wartime arrivals take some time to qualify as active members of the community and its machinery of justice cannot be expected instantaneously to reflect their presence. The official who compiled the jury lists testified as to Negro jurors that "from 1946 on I must have examined at least 500 myself." The number accepted for service could not be ascertained from the records, which make no notation of color, but he testified that there were "maybe two dozen; maybe three dozen." For the special panel, he testified that he had examined an estimated one hundred Negroes and had accepted "maybe a dozen." The testimony is undenied.

The record is utterly devoid of proof of systematic, intentional and deliberate exclusion of Negroes from jury duty.

The judgment is

*Affirmed.*

MR. JUSTICE MURPHY, with whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE concur, dissenting.

This case represents a tragic consequence that can flow from the use of the "blue ribbon" jury. Two men must forfeit their lives after having been convicted of murder not by a jury of their peers, not by a jury chosen from a fair cross-section of the community, but by a jury drawn from a special group of individuals singled out in a manner inconsistent with the democratic ideals of the jury system. That group was chosen because they possessed some trait or characteristic which distinguished them from the general panel of jurors, some qualification which made them more desirable for the State's purpose of securing the conviction of the two petitioners. Such a basis for jury selection has no place in our constitutional way of life. It contravenes the most elementary notions of equal protection and I can no more acquiesce in its use in this case than I was able to do in *Fay* v. *New York,* 332 U. S. 261.

The constitutional invalidity of this "blue ribbon" system does not depend upon proof of the systematic and intentional exclusion of any economic, racial or social group. Nor does it rest upon a demonstration that "blue ribbon" juries are more inclined to convict than ordinary juries. Such factors are frequently, if not invariably, present in "blue ribbon" situations, though proof is extremely difficult. But they are at best only the end products of the system, not the root evil.

The vice lies in the very concept of "blue ribbon" panels—the systematic and intentional exclusion of all but the "best" or the most learned or intelligent of the general jurors. Such panels are completely at war with the democratic theory of our jury system, a theory formulated out of the experience of generations. One is constitutionally entitled to be judged by a fair sampling of all one's neighbors who are qualified, not merely those with superior intelligence or learning. Jury panels are supposed to be representative of all qualified classes. Within those classes, of course, are persons with varying degrees of intelligence, wealth, education, ability and experience. But it is from that welter of qualified individuals, who meet specified minimum standards, that juries are to be chosen. Any method that permits only the "best" of these to be selected opens the way to grave abuses. The jury is then in danger of losing its democratic flavor and becoming the instrument of the select few.

Hence the "blue ribbon" method of selecting only the "best" of the general jurors, a method instituted with the highest of intentions, does violence to the fundamental precepts of the jury system. Appeals to administrative convenience do not soften that violence. And since the method deprives the defendant of the protection accorded others who are able to draw upon the general panel, it falls under the ban of the Fourteenth Amendment. I would therefore reverse the judgment below.