**Lillian M. HAAS, et al., Plaintiffs Below, Appellants,**

v.

**UNITED TECHNOLOGIES CORPORATION, a Delaware Corporation, Defendant Below, Appellee.**

Supreme Court of Delaware.

Submitted on Reargument Before the Court En Banc: June 21, 1982.

Decided: Aug. 25, 1982.*

* This opinion supercedes a previous opinion, issued by the Court en banc on March 15, 1982, which is hereby withdrawn.

Arthur Inden, Ben T. Castle (argued), Craig A. Karsnitz and Barry M. Willough-by, of Young, Conaway, Stargatt & Taylor, Wilmington, and Francis A. Ferrara of Kassab, Cherry, Curran & Archbold, Media, Pa., for plaintiffs below, appellants.

Edmund N. Carpenter, II (argued), Allen M. Terrell and Helen L. Winslow, of Richards, Layton & Finger, Wilmington, for defendant below, appellee.

Before McNEILLY, QUILLEN, HORSEY and MOORE, Justices, constituting the Court En Banc.

McNEILLY, Justice.

In this product liability case, we consider an appeal and cross appeal[1] from a jury verdict and judgment adverse to plaintiffs in the Superior Court. Two principal issues are presented for our review: (1) Did the Trial Judge, in his instructions to the jury, improperly preclude the jury from determining whether a helicopter manufactured by the defendant was defective for failure of its design to incorporate an in-cockpit instrument which could warn a pilot, while in flight, that a helicopter rotary blade was losing pressure and in danger of cracking;

---

1. Defendant cross appeals from the Trial Court's denial of a Motion for a Directed Verdict with respect to certain issues bearing upon liability. In view of our conclusions herein, we do not reach the issues raised by defendant in its cross-appeal.

and (2) Was the application of the Special Jury statute a violation of 10 *Del.C.* §§ 4501 and 4503 and the Due Process and Equal Protection clauses of the Federal and State Constitutions? We affirm.

I

This case, as with many products liability cases, has its origins in tragedy. On January 8, 1975, while enroute from New River, North Carolina to McGuire Air Force Base in New Jersey, a CH–53D Sea Stallion helicopter, manufactured by defendant's Sikorsky division, crashed near Salisbury, Maryland killing all five servicemen on board. Four of the men were Marine Corps crewmen.[2] The fifth serviceman was a member of the Air Force who was hitching a ride to the air base. Plaintiffs are the surviving spouses, children and personal representatives of the decedents. The parties agree that the helicopter crashed when one of its six rotors fractured in flight.

A.

Before we focus on the issues, some background information about defendant's aircraft is needed. The rotors on the Sea Stallion helicopter were hollow and were pressurized with nitrogen. If a crack developed in one of the rotor blades, or spars, the nitrogen would seep out leaving the spar depressurized. Of course, a loss in blade pressure while the aircraft was flying could be, and in this unfortunate case was, symptomatic of a crack, thus resulting in a crash and loss of life.

To forestall such occurrences, Sikorsky equipped the CH–53D helicopter with a safety device called a "BIM"—short for "Blade Inspection Method." The BIM utilized a gauge located at the base of each spar. If the rotor was fully pressurized, the gauge registered white; if the rotor was not fully pressurized, the gauge registered black. The gauge could only be inspected when the helicopter was on the ground with its blades stationary. Operation of the helicopter normally included a pre-flight check of all gauges. No inspection of the gauges was possible while the aircraft was airborne. The helicopter was not equipped with an in-cockpit warning device that would signal a blade crack while the helicopter was in flight.

B.

The parties agree that since the deaths of the servicemen occurred in Maryland, the law of that State is controlling. See Maryland Wrongful Death Act, Md. Code Ann., Cts & Jud. Proc. § 3–901 et seq. (1980). In *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976), Maryland's highest Court adopted Restatement (Second) of Torts § 402 A (1965) and its rationale of strict liability in tort for defective products. See *Singleton v. International Harvester Co.,* 4th Cir., 685 F.2d 112 (1981) (applying § 402 A as law of Maryland in defective design case).

Section 402 A reads:
"Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

 (a) the seller is engaged in the business of selling such a product, and

 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

 (a) the seller has exercised all possible care in the preparation and sale of his product, and

 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." *Id.*

The Maryland Court of Appeals adopted a seven factors test for determining whether a product was defectively designed under § 402 A. Those factors are:

**2.** The death of one of these airmen, the co-pilot, is not at issue in this case.

" '(1) the usefulness and desirability of the product. (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.' " *Phipps v. General Motors Corp.*, 363 A.2d at 959, *quoting* Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L.J. 5, 17 (1965).

After *Phipps,* then, a balancing test weighing the advantage and disadvantages of the allegedly defective design vis-a-vis an alternate design must be performed.

### C.

The theory of plaintiffs' case at trial was that defendant's helicopter was defective in design under Restatement (Second) 402A, supra, because it lacked an in-cockpit warning device and that this design defect rendered the helicopter fundamentally unsafe and ultimately caused the deaths of plaintiffs' decedents. We summarize the evidence bearing upon this contention.

Plaintiffs introduced evidence showing that an in-cockpit warning device for blade pressure was a necessary component of a helicopter designed for long-range flights and that such a system was available for use in certain other helicopter models. Although there was evidence that the CH–53D model in question was only designed with short range flights in mind, (i.e. flights of less than 5 hours) plaintiffs presented evidence that long range flights were contemplated by virtue of fuel extension tanks and a "hot refueling" technique. Provisions for the use of the fuel extension tanks were included in the specifications. "Hot refueling" was a method by which the helicopter could take on fuel while on the ground without the pilot having to shut off the engines, but precluding an inspection of the BIM gauges even though the aircraft was on the ground.

Defendant countered with evidence: (1) that cockpit BIMs were unreliable and dangerous because a false warning of loss of blade pressure might cause a pilot to bail out or attempt to land his aircraft in rough terrain unnecessarily damaging or destroying it in the process; and (2) that defendant repeatedly recommended installation of cockpit BIMs in the Sea Stallions upon learning that they were being used for long range flights exceeding two hours, but that those recommendations went unheeded by military authorities.

Defendant's defense of plaintiff's allegation of defective design by showing that the helicopter BIM system was an adequate safety device and that the negligence of both the air and maintenance crews resulted in the crash. To that end, defendant introduced evidence that the helicopter BIM showed black on each of the four days prior to the helicopter's ill-fated flight, and that the crew failed to remove and replace the depressurized spar despite such warnings and despite the mandate of the maintenance instruction manual. Instead, the spar was simply repressurized and the spars left in the at rest position during which there would normally be no depressurization through loss of nitrogen even though a crack in the spar itself was evident. There was also a lack of evidence concerning the ground crew's performance of a preflight "start up and stop" blade pressure check. Defendant also relied on the testimony of a Marine Corps officer, who, on the issue of the maintenance crew's failure to heed four days of black BIM warnings, conceded that "we had just missed it."

To parry defendant's argument and buttress their own claim that the helicopter without a cockpit BIM was fatally defective, plaintiffs presented testimony concerning the inability of the helicopter's BIM system to distinguish between a loss of pressure due to a cracking blade and a drop in pressure resulting from a defect in the BIM system itself, such as a leaking pres-

sure gauge. Plaintiff claimed that a "boy crying wolf" attitude developed among the maintenance crews because of repeated false warnings caused by the defective pressure gauges themselves.

■ Upon reviewing the sufficiency of the evidence, the Trial Judge found that there was a jury question presented on whether the absence of a cockpit warning device constituted a design defect and necessarily denied defendant's Motion for a Directed Verdict on the issue of liability.[3] We agree that there was a jury question on this issue. Restatement (Second) of Torts § 402A, supra. Compare *Roy v. Star Chopper Co., Inc.,* D.R.I., 442 F.Supp. 1010, 1020 (1977), *aff'd,* 5th Cir., 584 F.2d 1124 (1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1978); *Foster v. Ford Motor Co.,* 5th Cir., 616 F.2d 1304, 1309–11 (1980); *Schell v. AMF, Inc.,* 3rd Cir., 567 F.2d 1259, 1261 (1977); *Dorsey v. Yoder Co.,* E.D.Pa., 331 F.Supp. 753, 760 (1971); *Azzarello v. Black Bros. Co., Inc.,* 480 Pa. 547, 391 A.2d 1020, 1027 (1978); *Bexiga v. Havir Mfg. Corp.,* 60 N.J. 402, 290 A.2d 281, 285 (1972). The question remains, however, whether the Trial Court, in its jury instructions, properly submitted the issue of design defect for lack of a cockpit BIM to the jury or whether, as plaintiff asserts, the Court effectively precluded the jury from considering that issue by those same instructions.

## II

### A.

Plaintiffs proposed the following jury instructions on the design defect issue:

"Even had the visual 'BIM' system worked properly, Plaintiffs allege, it was inadequate and unsafe as a warning device since there was no 'inside-the-cockpit BIM' indicator to warn the helicopter's crew in flight of a crack in the blade. Since there was no system for warning the crew in flight of an impending blade fracture, Plaintiffs contend that the Sikorsky-built helicopter was defective.

If you find that the Sikorsky-built helicopter required a warning system for potential blade fractures in order for it to be operated safely, and if you find that the visual 'BIM' system was defective in this regard, either because it did not work as a warning system or because there was no 'inside-the-cockpit BIM' then you should find that the helicopter was defective."

The instructions actually given to the jury by the Trial Judge read, in pertinent part, as follows:

"Plaintiffs' claim of strict liability against Defendant Sikorsky is based on their contention that the crash was caused by an unreasonably dangerous defective condition in the helicopter. When I refer to "the helicopter" in this context, I also mean its warning system and the flight and maintenance manuals that accompany—accompanied it.

In order to recover against Defendant Sikorsky on this claim, the Plaintiffs must establish, by a preponderance of the evidence, the following four essential elements:

(1) the product was in a defective condition at the time that it left the possession or control of the manufacturer;

(2) that it was unreasonably dangerous to the users;

(3) that the defect was a proximate cause of the deaths; and

(4) that the product was expect [sic] to and did reach the user without substantial change in its condition.

A 'defect,' as I will use that term in these instructions, is a condition not contemplated by the ultimate user, which will be unreasonably dangerous to him.

In this connection, I call to your attention that certain witnesses have been asked whether their product did or did not have a defect. Their use of the term may or may not have coincided with the definition of that term that I have just

**3.** The Trial Judge directed a verdict for defendant on certain other issues; however, that rul-

ing is not contested in this appeal.

given you. In your deliberations, you must of course apply the legal definition of the term, as just given.

An 'unreasonably dangerous' product is one which is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product.

In order to determine that the helicopter in question was unreasonably dangerous in design, you must find that, at the time of manufacture, the likelihood that it would cause harm, and the seriousness of the harm, outweighed the burden on the manufacturer to design a product that would have prevented such harm, and the adverse effect that alternative design would have on the usefulness of the product.

Examples of factors that you may consider in making this evaluation include:

—any warnings and instructions provided with the product;

—the tehnological [sic] and practical feasibility of a product designed and manufactured so as to have prevented the harm while substantially serving the likely user's expected needs. In considering this you may consider the state of the art at the time that the product was designed and manufactured.

—the effect of any proposed alternative design on the usefulness of the product;

—the comparative costs of producing, distributing, selling, using, and maintaining the product as designed and as alternatively designed;

—the new or additional harms that might have resulted if the product had been so alternatively designed;

—the usefulness and desirability of the product;

—the availability of other and safer products to meet the same need;

—the likelihood of injury and its probable seriousness;

—the obviousness of the danger;

—the avoidability of injury by care in use of the product (including the effect of instructions or warnings);

—the ability to eliminate the danger without seriously impairing the usefulness of a product and making it—that is, or making it unduly expensive.

The Plaintiffs contend that the visual BIM warning system was inadequate because it did not incorporate any warning in the cockpit, it lost credibility as a result of warnings that did not indicate a crack in the blade, and the instructions and warnings in the flight and maintenance manuals were inadequate.

The Defendant disputes each of these contentions.

In order to prevent the helicopter from being unreasonably dangerous, Sikorsky was required to design an adequate warning system and to give adequate directions as to its maintenance and use. Although a manufacturer is required to design a product that is not defective and unreasonably dangerous, this does not mean that it is required to include every possible safety device. Thus, if you find that the visual BIM system and applicable manuals were adequate, you may not find Sikorsky liable for failure to install an indicator in the cockpit.

In order to determine that the product was defective and unreasonably dangerous because adequate warnings and instructions were not provided about a danger connected with the helicopter or its proper maintenance or use, you must find that, at the time of manufacture, the likelihood that the product would cause harm and the seriousness of the harm rendered the manufacturer's instructions inadequate, and that the manufacturer should and could have provided the instructions or warnings which the Plaintiffs allege would have been adequate.

Examples of factors that you may consider in making this evaluation include the intended or reasonably anticipated use of the product; the manufacturer's ability, at the time of manufacture, to be aware of the product's danger and the nature of the potential harm; the manufacturer's ability to anticipate that the likely product user would be aware of the product's danger and the nature of the

potential harm; the technological and practical feasibility of providing adequate warnings and instructions; the clarity and conspicuousness of the warnings or instructions that were provided; the adequacy of the warnings or instructions that were provided; whether reasonably prudent persons who are likely to maintain and use the product should be expected to understand and follow the warnings and instructions.

If you find that the warnings and instructions at the time of manufacture were not adequate, and that this was a proximate cause of the crash, then your verdict should be for the Plaintiffs. On the other hand, if you find that the warnings and instructions at the time of manufacture were adequate, and that the crash would have been avoided if they had been followed, then your verdict should be for the Defendant."

After the jury was so instructed, plaintiffs excepted to the "language which makes Sikorsky liable for failure to install an indicator in the cockpit contingent upon a finding that the visual BIM was inadequate." Plaintiffs repeated this objection in a Motion for a New Trial. The Trial Judge viewed his instructions as a correct statement of the substantive law of Maryland in design defect cases and as a proper submission of the cockpit BIM issue to the jury and denied the motion.

Plaintiffs complain in this appeal that the instructions given improperly predicated jury consideration of the cockpit BIM upon a finding by the jury that the "visual BIM system and applicable manuals" were inadequate. In other words, the plaintiffs argue that the jury was erroneously instructed to disregard any consideration of the cockpit BIM at all unless it found, initially, that the visual BIM system was an inadequate safety device. Plaintiffs single out the following sentence of the above quoted instructions as the culprit in allegedly leading the jury astray in its deliberations: "Thus, if you find that the visual BIM system and applicable manuals were adequate, you may not find Sikorsky liable for failure to install an indicator in the cockpit."

**B.**

We do not accept plaintiffs' construction of the jury charge and find to the contrary that the Trial Judge's instructions did not effectively confuse or withdraw the cockpit BIM question from the jury.

The test for determining the propriety of a jury instruction does not demand perfection. In general, a trial court's instructions will not be the basis for reversible error if they "are reasonably informative and not misleading, judged by common practices and standards of verbal communication." *Baker v. Reid,* Del.Supr., 57 A.2d 103, 109 (1947). See also *Storey v. Castner,* Del.Supr., 314 A.2d 187, 194 (1973). But if the alleged impropriety in the jury instructions "undermined ... the jury's ability to 'intelligently perform its duty in returning a verdict,'" this Court will reverse. *Newnam v. Swetland,* Del.Supr., 338 A.2d 560, 562 (1975), *quoting Storey v. Castner,* 314 A.2d at 194. In judging the propriety of a jury charge, the entire instruction is considered with no statement to be viewed out of context. *Spahn v. People's Ry. Co.,* Del. Supr., 92 A. 727, 729 (1912); *Baker v. Reid,* 57 A.2d at 109. See also *Franklin v. Salminen,* Del.Supr., 222 A.2d 261, 263 (1966). "[S]ome inaccuracies and inaptness in statement are to be expected in any charge." *Baker v. Reid,* 57 A.2d at 109.

Viewed in its entirety, as it must, the jury charge is an accurate reflection of Maryland law applicable to defective design cases. See *Singleton,* supra; *Phipps,* supra. The jury was directed to undertake the balancing test and weigh those factors, approved by the *Phipps* Court and reiterated in *Singleton,* bearing upon the safety of the helicopter as designed with the helicopter alternately designed, *i.e.,* with a cockpit BIM. Thus, the jury charge squarely presents the issue of cockpit BIM to the jury. Those passages from the instructions which we have quoted above direct the jury to look at other safety devices in evaluating the adequacy of the visual BIM as a safeguard for human life. The only alternative

safety device discussed throughout the course of the trial and, therefore, the only alternative to be considered by the jury was the cockpit BIM. Thus, the Trial Judge was commanding the jury to consider the availability, safety, feasibility and cost of the cockpit BIM at the same time that it was reviewing the adequacy of the visual BIM system. As is evident from the instructions the Trial Court also reminded the jury of plaintiffs' contention on the cockpit BIM question. In light of the instructions taken as a whole, it would not be fair or reasonable to focus in on one passage of the charge and stretch it into a basis for reversal. Indeed, under the Delaware authorities cited above, we cannot do so. Maryland law is the same. See *Beahm v. Shortall,* 279 Md. 321, 368 A.2d 1005 (1977); *Clayborne v. Mueller,* 266 Md. 30, 291 A.2d 443 (1972); *Nora Cloney & Co. v. Pistorio,* 251 Md. 511, 248 A.2d 94 (1968); *West v. Belle Isle Cab Co.,* 203 Md. 244, 100 A.2d 17 (1953); *Rabinovitz v. Kilner,* 206 Md. 455, 112 A.2d 483 (1955). We read the word "adequate" in the line which plaintiffs assail as requiring the jury necessarily to evaluate the cockpit BIM factor *in connection with* their evaluation of the visual BIM. The jurors were *not* instructed to focus their attention on the visual BIM only excluding all consideration of the cockpit BIM. In our view the instructions did not prohibit the jurors from reaching the cockpit issue unless, as plaintiffs believe, they first ascertained that the visual BIM by itself was inadequate.

Moreover, it is difficult for this Court to believe that the jury did not consider the cockpit BIM issue when the bulk of counsel's efforts and reams of testimony over the course of the two month trial were specifically directed to the respective virtues and disabilities of the cockpit and visual BIMs. The jurors were reminded repeatedly in the opening arguments of counsel, through the presentation of evidence (summarized above at length), in the closing arguments of counsel, and in the charge itself that cockpit BIM was a factor to be taken into account in deciding whether defendant's helicopter was defective. Hence, we stand convinced that the instructions did not mislead nor withdraw that issue from the jury. Any impreciseness in the one line of the jury charge complained of was cured by the instructions viewed as a whole and is not the basis for a reversal here.

### III

We now turn to the second issue, namely, whether the application of the Delaware Special Jury Statute to the facts of this case violated 10 *Del.C.* §§ 4501[4] and 4503[5] and the Due Process and Equal Protection clauses of the Federal and State Constitutions.

### A.

Specifically, plaintiffs contend that the application of the Special Jury Statute (Statute) in this case deprived them of due process and equal protection of the law because the Statute does not contain objective criteria for selection of the pool of individuals from which the special jury was drawn and because the Prothonotary allegedly excluded certain identifiable groups (women and young people) from the pool arbitrarily. Plaintiffs also ask that we overrule this Court's decision in *Nance v. Rees,* Del.Supr., 161 A.2d 795 (1960), wherein the constitutionality of the Delaware Special Jury Statute was upheld against a challenge on due process grounds. Second,

---

4. 10 *Del.C.* § 4501 provides:

 "It is the policy of the State that all litigants in state courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the county wherein the court convenes. It is further the policy of the State that all citizens shall have the opportunity to be considered for service on grand and petit juries in the courts of the State, and shall have an obligation to serve as jurors when summoned for that purpose."
 *Id.*

5. 10 *Del.C.* § 4503 provides:

 "No citizen shall be excluded from service as a grand or petit juror in the courts of the State on account of race, color, religion, sex, national origin or economic status."
 *Id.*

plaintiffs argue that the Statute must be reexamined in light of the enactment of 10 *Del.C.* §§ 4501 and 4503 which call for non-discriminatory and random selection of grand and petit juries to ensure representation of a fair cross section of the county in which the court convenes.

Defendant Sikorsky asserts that both the United States Supreme Court and this Court have upheld the constitutionality of special juries, that §§ 4501 and 4503 apply only to grand and petit juries and not to special juries, and that the Statute as applied below was fair to all parties and violated neither the Due Process nor Equal Protection clauses of the Federal and State Constitutions.

### B.

Provision for special juries is made in 10 *Del.C.* § 4541. The Delaware Special Jury Statute reads:

"(a) A special jury for the trial of a cause, shall be ordered by the Court upon the application of either party.

(b) The party applying for the special jury under this section shall give due notice to the opposite party, and to the Prothonotary, of the time and place of striking such jury. At such time and place the Prothonotary, or his deputy, or if the Prothonotary is not indifferent between the parties, then 2 proper persons indifferent between the parties, appointed by the Superior Court, shall attend with a list of 48 indifferent and judicious citizens of the county, qualified to serve as jurors, showing their names and places of abode.

(c) The party applying for the special jury under this section, his agent or attorney, shall first strike out one of the names, and then the opposite party, his agent or attorney, shall strike out another; and so on, until each shall have struck out 12. If the opposite party, or any person on his behalf, shall not attend, or shall refuse to strike, the Prothonotary or his deputy, or the persons appointed to strike the jury, as the case may be, shall strike for the party not attending, or refusing to strike.

(d) After each party shall have struck 12 names under this section, the remaining 24 persons on the list shall be the jury to be returned for the cause. The Prothonotary, or his deputy, or the persons appointed to strike the jury, as the case may be, shall thereupon deliver to the sheriff a certified list of the names of such persons, with their places of abode, as the jurors to be summoned for the cause, annexed to a venire facias commanding him to summon them. The sheriff shall, thereupon, summon the persons named, according to the command of the writ, and shall return the list with the venire."

*Id.*

A special jury is impanelled as follows:

"At the trial of the cause, a special jury shall be drawn from the list, returned under § 4541 of this title, in the manner provided in this chapter for other cases. In the selection of a special jury, if any of the 24 persons remaining on the list as provided in § 4541 of this title, are unable to sit as jurors, for any reason satisfactory to the Court, the Court may in its discretion limit the challenges by each party to not less than 3. If the panel is reduced, however, to less than 18, the Court shall dismiss the jury, unless the party requesting the special jury waives sufficient of his challenges to permit a jury to be selected. The costs of the special jury so dismissed in such case shall be borne by the party requesting the special jury."

*Id.* § 4542.

The procedure for requesting a special jury is governed by Superior Court Rule 40(b) which provides:

"Application for a special jury shall be made at or before the marking of the case for trial. A party who has applied for a special jury may withdraw such application and have the case tried by the general jury, provided that the granting of such withdrawal will not unduly prejudice or inconvenience an opposing party."

*Id.*

In *Nance,* supra, this Court, after reviewing the history of special juries in Delaware and England before 1776, concluded that the Statute violated neither the Due Process clause of the Federal Constitution nor the right to trial by jury provision of Article I, § 4 of the Delaware Constitution. In considering plaintiffs' request that *Nance* be overturned, we draw liberally from our discussion on the development of the special jury procedure contained therein.

Special juries, commonly referred to as "blue ribbon" or "struck" juries, were first provided for in Delaware in An Act for Regulating the Trial of Causes by Special Juries, 4 *Del. Laws* c. CXX, at 322 (1810). The practice of using special juries, however, existed before enactment of this law. For example, struck juries were discussed in Rule 17 of the Delaware Supreme Court, 1 Del.Cas. XL (1790),[6] briefly referred to in An Act For More Certainly Obtaining Returns of Special Juries, And Their Better Regulation, 2 *Del.Laws* c. VIIIc, at 1071 (1793) and are noted in several of Delaware's oldest reported cases decided shortly after the American Revolution. See *Burton's Lessee v. Prettyman,* Del.Supr., 1 Del. Cas. 11 (1793); *Newbold's Lessee v. Stockley,* Del.Supr., 1 Del.Cas. 10 (1793); *Polk's Lessee v. Ross,* Del.Com.Pl., 1 Del.Cas. 40 (1794). The procedure for selecting a special jury has also been discussed by Delaware courts in more recent times. See *Robelen Piano Co. v. DiFonzo,* Del.Supr., 172 A.2d 568 (1961); *Sharpe v. Thompson,* Del. Super., 147 A.2d 649 (1958); and *O'Mallie v. Harlan & Hollingsworth,* Del.Super., 99 A. 428 (1916).[7]

The special jury is not an American invention. It was well known in English common law and one scholar has traced it back to the 14th century. Thayer, *The Jury and Its Development,* 5 Harv.L.Rev. 295 (1889). The *Nance* Court placed the probable origin of the 1810 Delaware statute in an English statute, 2 Geo. II. c. 25, and stated that "the Act of 1810 did no more than codify into statutory law a practice long followed in Delaware courts as a part of the legal heritage from England." *Nance v. Rees,* 161 A.2d at 799.

 Special juries were originally struck in cases "of too great nicety" for an ordinary panel and to prevent suspected partiality. III *Blackstone's Commentaries* § 357 (Sharswood ed.) Although they have been the subject of much debate in scholarly literature[8] and have suffered a certain amount of judicial criticism,[9] the special jury as an institution is ensconced in Delaware law and is not constitutionally infirm.

### C.

Having reiterated our belief that the Delaware Special Jury Statute is constitutional on its face, we now consider whether the Statute is constitutional as applied.

The United States Supreme Court has heard many challenges to Federal and state jury selection practices. Typically, such challenges were founded upon allegations that the selection procedures purposefully and intentionally excluded a certain group of qualified jurors and, consequently, the jury panel did not represent a fair cross section of the community. Those challenges have been brought under: the Sixth

**6.** Under the Delaware Constitutions of 1776 and 1792, the Delaware Supreme Court was a Court of original jurisdiction. Del.Const. art. VI, § 8 (1792); Del.Const. art. XVII (1776).

**7.** For a discussion of past Delaware procedure with respect to requesting a special jury, see 1 Wooley, on Delaware Practice, § 561, at 402–03.

**8.** See, e.g., Luneburg & Nordenberg, *Specially Qualified Juries and Expert Non Jury Tribunals: Alternatives for Coping With the Complexities of Modern Civil Litigation,* 67 Va.L.

Rev. 887 (1981); Baker, *In Defense of the "Blue Ribbon" Jury,* 35 Iowa L.Rev. 409 (1950); Thatcher, *Why Not Use the Special Jury"?* 31 Minn.L.Rev. 232 (1947); Note, *The Case for Special Juries in Complex Civil Litigation,* 89 Yale L.J. 1155 (1980).

**9.** See *Moore v. New York,* 333 U.S. 565, 569–70, 68 S.Ct. 705, 707, 92 L.Ed. 881 (1948) (Murphy, J., dissenting); *Fay v. New York,* 332 U.S. 261, 296–300, 67 S.Ct. 1613, 1632–34, 91 L.Ed. 2043 (1947) (Murphy, J., dissenting); *Robelen Piano Co. v. DiFonzo,* 172 A.2d at 571.

Amendment (right to a speedy and public trial in criminal actions before an impartial jury), see e.g. *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); the Fifth Amendment (right to indictment by a grand jury in Federal felony actions, see e.g., *Castaneda v. Partida,* 430 U.S. 482, 508–18, 97 S.Ct. 1272, 1287–92, 51 L.Ed.2d 498 (1977) (Powell, J., dissenting); *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); and the Due Process and Equal Protection clauses of the Fourteenth Amendment, see e.g., *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), and *Akins v. Texas,* 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945).

■■■■ The Supreme Court has reiterated the basic principle that a jury must be drawn from a pool that is truly representative of a cross-section of the community. See *Taylor v. Louisiana,* 419 U.S. at 527–28, 95 S.Ct. at 696; *Thiel v. Southern Pacific R. R.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946); *Glasser v. United States,* 315 U.S. 60, 85, 62 S.Ct. 457, 471, 86 L.Ed. 680 (1942). The absence of any cognizable or identifiable group from the jury or jury pool, however, does not offend the Constitution unless it is the result of a systematic exclusion of that group. *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (White, J., plurality opinion); *Thiel,* supra, 328 U.S. at 220, 66 S.Ct. at 985 or purposeful discrimination. *City of Mobile v. Bolden,* 446 U.S. 55, n. 24, 100 S.Ct. 1490, 1505 n. 24, 64 L.Ed.2d 47 (1980); *Akins v. Texas,* 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945).

The United States Supreme Court has examined and upheld the constitutionality of state special jury statutes on several occasions. See *Moore v. New York,* 333 U.S. 565, 68 S.Ct. 705, 92 L.Ed. 881 (1948); *Fay v. New York,* 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); *Brown v. New Jersey,* 175 U.S. 172, 20 S.Ct. 77, 44 L.Ed. 119 (1899). However, these cases involved challenges to the special jury statute by a defendant in a *criminal* context. The Supreme Court has not yet reviewed the constitutionality of a special jury statute in a *civil* setting. The one Supreme Court case dealing specifically with a challenge to a civil jury did not involve a blue ribbon jury and was decided not on constitutional grounds, but upon the supervisory power of the Court over the administration of justice in the Federal system. *Thiel v. Southern Pacific R. R.,* supra.[10] Moreover, cases based upon the Fifth and Seventh Amendments do not apply here because those Amendments have not been held applicable to the States under the Fourteenth Amendment (and the Fifth Amendment right to a Grand Jury is clearly not applicable in a civil case). See *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (Marshall, J., plurality opinion); *Melancon v. McKeithen,* E.D.La., 345 F.Supp. 1025 (1972), aff'd sub nom., *Davis v. Edwards,* 409 U.S. 1098, 93 S.Ct. 908, 34 L.Ed.2d 679 (1973). Furthermore, it is not clear that the same Due Process and Equal Protection standards applicable to jury selection in a criminal trial would be applicable in a civil trial. Luneburg & Nordenberg, *Specially Qualified Juries and Expert Non Jury Tribunals: Alternatives for Coping With the Complexities of Modern Civil Litigation,* 67 Va.L.Rev. 887, 922–26 (1981).[11] And the

10. It should be noted that the Supreme Court has heard and decided two class action civil suits brought by persons who alleged that state jury selection procedures unconstitutionally excluded them from grand and petit jury service and from service on the County Board of Education (because the Board was selected by the grand jury). *Carter v. Jury Comm'rs,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 532 (1970). Although not specifically attacks on the selection of a civil jury, arguably

they were challenges to the procedure for selecting civil and criminal juries. In *Carter,* the Court found as a constitutional right that the source of the jury selection list reasonably reflect " 'a cross section of the population suitable in character and intelligence for that civil duty.' " 396 U.S. at 333–34, 90 S.Ct. at 525–526 *quoting Brown v. Allen,* 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953).

11. The Supreme Court has stated that the reasons for trial by jury in a criminal context and in a civil context are different. For example, in

most recent Supreme Court case upholding a state special jury selection procedure in a criminal context is more than thirty years old, and its validity today, in light of recent cases, is questionable.[12]

■ To support their contention of intentional, purposeful, arbitrary and systematic exclusion of women and young people from the jury pool, plaintiffs rely on statistics which show that the population of New Castle County was 53% female, that the jury pool was only 33.9% female, that the jury panel in this case was only 16% female, and that the youngest member of this struck jury was 37. Assuming, for the sake of argument, that the standards discussed above are applicable to this civil special jury case, we conclude that plaintiffs have not made out a case for unconstitutional exclusion of identifiable groups from the special jury. The figures submitted by plaintiffs may be suspect but do not show intentional and systematic exclusion. And as we stressed earlier, a criminal defendant is not constitutionally entitled to proportional representation of any particular group on the jury or in the venire from which it is drawn. Only purposeful or intentional exclusion is barred. See *Taylor v. Louisiana,* 419 U.S. at 539, 95 S.Ct. at 702; *Cassel v. Texas,* 339 U.S. 282, 289–90, 70 S.Ct. 629, 633, 94 L.Ed. 839 (1950); *Neal v. Delaware,* 103 U.S. 370, 394, 26 L.Ed. 567 (1880). Hence, we hold that plaintiffs have not established that the special jury statute, as applied in this case, was in violation of their constitutional rights.

### D.

Nevertheless the procedure for selecting special juries in Delaware has the potential for abuse and this Court cannot permit that potential from ever being realized. Neither the Statute nor the Superior Court Rule contain guidelines or criteria for the selec-tion of special jury pools. An affidavit by the Superior Court Administrator, relied upon by plaintiffs, indicated, among other things, that there were not articulable guidelines used in special jury selection by Jury Commissioners, that the Commissioners "elected to use education and age as their criteria," and that they "selected persons with more than 12 years of formal education and intentionally avoided selecting persons either in their twenties or seventies."

In 1976 our Legislature undertook a broad reform of the "trial by jury" statute. Recognizing that "the American tradition of trial by jury ... necessarily contemplates an impartial jury drawn from a cross section of the community." *Thiel,* 328 U.S. at 220, 66 S.Ct. at 985, the Delaware General Assembly enacted 10 *Del.C.* §§ 4501 and 4503, supra. Section 4501 embodies State policy "that all litigants in state courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the county wherein the court convenes." *Id.* Section 4503 prohibits the exclusion of a person from service as a grand or petit juror "on account of race, color, religion, sex, national origin or economic status." *Id.* The legislative revision left untouched the provisions of the Special Jury Statute, and we are satisfied that the Legislature intended to preserve the special jury practice when it did not repeal the statutory authority for it at the time that the reforms were made. We have already referred to the long history of the special jury practice in Delaware and, when properly selected, the practice has much to commend it. See *Luneburg v. Nordenberg,* supra; Note *The Case for Special Juries in Complex Civil Litigation,* 89 Yale L.J. 1155 (1980). However, the present practice may not produce a jury pool that is representative of the community or consistent with the public policy announced in 10 *Del.C.* §§ 4501 and 4503.

*Colgrove v. Battin,* 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), the Court stated that the purpose of trial by jury in a criminal case is to prevent oppression by the government, and in a criminal *and civil* case to assure fair and equitable resolution of factual issues.

12. For example, *in Fay v. New York,* supra, the Supreme Court did not find a constitutional problem with selecting only those women who had volunteered or whose names had been submitted by the League of Women Voters. Cf. *Duren v. Missouri,* supra.

Thus, we resort to our power under the Constitution to supervise the administration of justice in Delaware and to promulgate rules of procedure. Del.Const. art. IV, § 13 (1897); *State v. Terry,* Del.Supr., 148 A.2d 102 (1959). Pursuant to that power and drawing upon the deference traditionally accorded to the states in the establishment of juror qualifications and selection procedures, see *Taylor v. Louisiana,* supra; *Carter v. Jury Comm'rs,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *Brown v. New Jersey,* supra; *Jugiro v. Brush,* 140 U.S. 291, 11 S.Ct. 770, 35 L.Ed. 510 (1891), we may authorize the revision of arbitrary or potentially discriminatory court procedures and practices to comport with constitutional principles. Exercising such power, we commend to the Superior Court the delicate and difficult task of drafting a Rule of Court stating criteria and guidelines for the selection of special juries to ensure "a cross section of the population suitable in character and intelligence for that civil duty." *Brown v. Allen,* 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953).

██ In drawing up criteria for the special jury selection process, the Superior Court should be mindful of the twin goals of achieving a fair representation of the community on the jury panel while providing for intelligent, educated and competent jurors for the adjudication of complex cases. See 10 *Del.C.* § 4503; *ABA Standards Relating to Trial by Jury* § 2.1 (approved draft 1968). We offer as a suggestion, and without fettering the Superior Court's discretion in this matter, that jurors be randomly selected from a special jury pool comprised of individuals meeting specified age, intelligence and educational requirements and, to the extent deemed legally permissible by the Superior Court, possessing special occupational skills. Perhaps a minimum educational requirement of a bachelor's degree from an accredited college or university might be one of those criteria.

In response to this Court's directive contained in our earlier Opinion in this matter, now superceded, the Superior Court has submitted a proposed plan and Rule for Selection of Special Juries which is now pending for further study and approval of this Court. Until the proposed Rule or an alternative Rule is approved and the selection process is in place, the Superior Court shall not schedule any trial by special jury.

\* \* \* \* \* \*

AFFIRMED.